NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12055


COMMONWEALTH  vs.  MARCUS THOMAS.



Hampden.     October 7, 2016. - February 13, 2017.

Present:  Gants, C.J., Botsford, Lenk, Hines, Gaziano, Lowy, &
Budd, JJ.


Constitutional Law, Identification.  Due Process of Law,
    Identification, Identification of inanimate object.
    Evidence, Identification, Identification of inanimate
    object.  Identification.  Practice, Criminal, Motion to
    suppress.




Indictments found and returned in the Superior Court
Department on April 3, 2015.

Pretrial motions to suppress evidence were considered by
Edward J. McDonough, Jr., J.

Applications for leave to prosecute interlocutory appeals
were allowed by Spina, J., in the Supreme Judicial Court for the
county of Suffolk, and the appeals were reported by him to the
Appeals Court.  The Supreme Judicial Court granted an
application for direct appellate review.


Heidi M. Ohrt-Gaskill, Assistant District Attorney, for the
Commonwealth.
Paul R. Rudof, Committee for Public Counsel Services, for
the defendant.
The following submitted briefs for amici curiae:

David Zhang, of China, Karen A. Newirth, of New York, Joshua Asher, of Illinois, & Radha Natarajan & Kirsten Mayer for The Innocence Project, Inc. & another.

Anthony D. Mirenda, Michael J. Licker, Melissa A. Stewart, & Chauncey Wood for Massachusetts Association of Criminal Defense Lawyers.

GANTS, C.J.  These interlocutory appeals from two rulings on motions to suppress raise three substantial issues regarding eyewitness identification.  First, we consider what consequence, if any, is appropriate where a police officer who is showing a photographic array to an eyewitness fails to use the protocol that we outlined in Commonwealth v. Silva-Santiago, 453 Mass. 782, 797-798 (2009), despite our declaration in that opinion that we "expect" police to use the protocol in the future.  Second, we examine whether, based on subsequent research, we should revisit the conclusion we reached in Silva-Santiago, supra at 798-799, and confirmed in Commonwealth v. Walker, 460 Mass. 590, 602-603 (2011), that the choice of a simultaneous rather than a sequential display of photographs in an array may be relevant to the weight to be given to an identification but does not affect its admissibility.  The third issue concerns the identification of an inanimate object -- a firearm.  We determine whether suggestive police questioning and subsequent police confirmation appropriately may result in suppression of the identification of a firearm as the firearm used by the defendant during the commission of the crime.

These issues arise in the context of cross interlocutory appeals:  the defendant's appeal of the denial of his motion to suppress the identification of him by an eyewitness, Brianna Johnson, who was familiar with the defendant and knew his first name; and the Commonwealth's appeal of the allowance of the defendant's motion to suppress the identification of a firearm by Johnson as the one used by the defendant in the commission of the crime.  We affirm the judge's ruling on both motions.[1]

Background.  There was no evidentiary hearing conducted regarding the two motions to suppress.  The Commonwealth and the defendant instead submitted to the motion judge various exhibits, including a joint stipulation of facts and videotaped recordings of two interviews with Johnson, the first conducted on the evening of the incident and the second conducted four days later, after the defendant had been arrested and a firearm that had allegedly been in his possession had been found.  Because we are in the same position as the motion judge to make findings, we do not limit the facts recited below to the facts found by the motion judge.  See Commonwealth v. Neves, 474 Mass. 355, 360 (2016), quoting Commonwealth v. Novo, 442 Mass. 262, 266 (2004) (where decision is based on recorded rather than live

---

[1] We acknowledge the amicus briefs submitted by The Innocence Project, Inc., and the New England Innocence Project; and by the Massachusetts Association of Criminal Defense Lawyers.

testimony, "we will 'take an independent view' of recorded confessions and make judgments with respect to their contents without deference to the fact finder, who 'is in no better position to evaluate the[ir] content and significance'").

In Springfield early in the evening of September 21, 2014, the defendant was in the rear passenger seat of a vehicle driven by Tavis Humphrey-Frazer; Johnson sat in the front passenger seat. According to Johnson, the defendant stated that he saw a particular individual among a crowd of people standing in front of a house on Smith Street. Humphrey-Frazer turned the vehicle onto Smith Street and drove towards the group of people. The defendant leaned out of the rear driver's side window and fired one or two shots at the group before his firearm jammed, and then was able to fire one or two more rounds in the direction of the group. The defendant's gunshots were met by return fire; a bullet penetrated a window of the vehicle and struck Humphrey-Frazer in the head, killing him.

Later that night, Springfield police Detectives Kevin Lee and Anthony Pioggia interviewed Johnson at the Springfield police station. Johnson said that her cousin, Humphrey-Frazer, received a telephone call from "Marcus," who was a member of the same gang as was Humphrey-Frazer. Humphrey-Frazer asked Johnson if she wanted to join him while he drove to pick up Marcus, and she agreed. When asked to tell the detectives about Marcus,

Johnson said, "I don't know that much about him."  She explained that he was Humphrey-Frazer's friend, not her friend.  She said she did not see Marcus that often "because . . . [they] don't associate with the same people."  After saying that she had seen Marcus at a party, she added, "I just know it's him because he's known up here."  She said that Marcus "look[s] like he's [nineteen] or something," and is "kind of chunky."  She assured the detectives that she would recognize him if she saw him.

The detectives then stopped the interview in order to perform an identification procedure.[2]  They presented Johnson with a computer screen that simultaneously displayed photographs of eleven individuals.  No cautionary warnings were given to Johnson; the detectives simply asked her to sit down, "[l]ook at the pictures . . . [a]nd if [she saw] somebody [she] recognize[d] in relation to [the] incident, to identify them if

_____

[2] The identification procedure occurred in a separate room in the police station and was not recorded.  Immediately afterward, the detectives asked Brianna Johnson to confirm the details and results of the procedure on the videotaped recording and to sign the photograph she had identified.  This recording suggests that the same detectives who conducted the interview with Johnson also administered the identification procedure.  The defendant does not argue that the failure to use a double-blind identification procedure requires suppression of the identification.  See Commonwealth v. Silva-Santiago, 453 Mass. 782, 797-799 (2009) (absence of double-blind identification procedure, where administering officer does not know which photograph depicts suspect, is relevant to weight of identification, not admissibility).

[she] could."[3]  Johnson picked a photograph of the defendant and signed a copy of that photograph.

After the interview, an arrest warrant issued against the defendant.  On September 23, Detectives Lee and Pioggia saw the defendant in Springfield riding a motorized scooter and pursued him, using their lights and sirens in an attempt to cause him to stop.  The defendant drove the scooter to a grassy area and then drove back into the street, where he lost control of the scooter and was apprehended.[4]  The next morning, a canine unit from the State police searched the grassy area and found a nine

---

[3] Later during the interview on September 21, 2014, the detectives asked Johnson to examine a separate photographic array in search of anyone whom she recognized to be among the group of persons on Smith Street in Springfield.  Before showing her these photographs, Detective Anthony Pioggia told her, "I have to go through . . . what's called an identification protocol . . . .  It's something that the courts ask that we ask people to read and hopefully understand before looking at pages of photographs like this."

[4] After the defendant had been arrested, he agreed to be interviewed and confirmed that he had been in the vehicle with Tavis Humphrey-Frazer at the time of the shooting.  The defendant argues that, because the arrest was based on Johnson's unconstitutional identification procedure, his statements should be excluded as "fruit of the poisonous tree."

[4] After the defendant had been arrested, he agreed to be interviewed and confirmed that he had been in the vehicle with Tavis Humphrey-Frazer at the time of the shooting.  The defendant argues that, because the arrest was based on Johnson's unconstitutional identification procedure, his statements should be excluded as "fruit of the poisonous tree."

millimeter handgun, loaded with a magazine containing twelve rounds of ammunition.[5]

The next day, September 25, Detectives Lee and Pioggia brought Johnson back to the police station for a second interview.  At the first interview, Johnson had told the detectives that the firearm used by the defendant was "big" and "black" and looked like the gun carried by the detectives.  At the second interview, conducted by Detective Lee and Detective Timothy Kenney, Detective Lee started to question Johnson again about the gun when Detective Kenney interrupted and asked, "Can I go after something here at this juncture?"  Detective Kenney then placed a photograph of a gun onto the table in front of Johnson.  "That's probably it, yup," Johnson responded.

Detective Kenney:  "That's probably it?"

Detective Lee:  "Brianna, did you see him with this type of gun before?"

Johnson:  "Wow."

Detective Lee:  "Brianna?"

Johnson:  "Hold on.  I'm thinking."

Detective Lee:  "Okay.  I mean, the picture is the picture, right?  It's a photograph."

Johnson:  "Yeah."

---

[5] The record does not reflect whether this weapon was tested for the defendant's fingerprints or whether ballistics tests were conducted to determine if the gun fired any of the shots at the group on Smith Street.

. . .

    Detective Lee: [Grabs photograph away] "Let me show the camera what we're showing you, okay? [Turning back to Johnson] Black, right? Black?"

    Johnson: "Hold on."

    Detective Lee: "All right."

    Johnson: "I've got to look at it. Yeah. Is this the gun?"

    Detective Lee: "You tell us. Does it look like the gun he had?"

    Johnson: "I think so, yeah. Because I remember this part."

    Detective Lee: "What do you remember? What are you pointing to?"

    Johnson: "This, this, this whole right here [pointing]. It's like little scratches on it just like this."

    Detective Lee: "And you remember those scratches?"

    Johnson: "Yeah because I looked back when he was going like this, like that." [Simulating a person trying to unjam a gun][6]

The conversation turned briefly to discuss the angle from which Johnson saw the defendant holding the weapon and struggling with it after it jammed. Detective Kenney then asked Johnson to sign the photograph, and the discussion continued.

    Detective Lee: "That's what you described even the night of the murder."

    Johnson: "Wow."

---

    [6] The record does not include a photograph of the firearm, and the so-called "scratches" cannot easily be identified or seen on the videotape.

Detective Lee:  "You said a big black handgun."

Johnson:  "Wow.  This is crazy."

Detective Lee:  "Looks just like it, huh?"

Johnson:  "It looks just like it."

Detective Lee:  "Good."

Johnson:  "Wow.  That's crazy."

Detective Lee:  "We're smarter than you think, aren't we?"

Johnson:  "Yeah."

After a Hampden County grand jury returned indictments against the defendant on various charges, including three counts of armed assault with intent to murder, illegal possession of a firearm, and murder in the second degree,[7] the defendant moved to suppress Johnson's identification of him and her identification of the firearm.  In denying the defendant's motion to suppress Johnson's identification of him, the judge concluded that it was "advisable" for the police to use the Silva-Santiago protocol before showing an eyewitness a photographic array because we had declared that we expected police to use the protocol.  But the judge declared that "this expectation is not black letter law

---

[7] The Commonwealth does not allege that the defendant fired the bullet that killed Humphrey-Frazer.  Rather, it alleges that he is legally responsible for Humphrey-Frazer's death because he initiated the gunfight, and the "natural and probable consequence" of that conduct was that someone would shoot back. We do not address whether this theory is a legally valid basis to support a conviction of murder in the second degree.

that requires mandatory adherence." He also concluded that the defendant did not show "that the absence of a protocol begets a finding of undue suggestiveness." The judge also found that the police use of a simultaneous rather than a sequential display of photographs was not unnecessarily suggestive. Where the defendant offered no evidence to suggest that the photographs in the array impermissibly distinguished the defendant or were otherwise suggestive, the judge concluded, based on the totality of the circumstances, that "the identification procedure employed by the police, though less than ideal, was not unduly suggestive."

In allowing the defendant's motion to suppress Johnson's identification of the firearm, the judge found that the use of a single photograph in the identification procedure was unduly suggestive in the absence of exigent circumstances, and that this was "an extreme case" that "rises to the level of a denial of due process," rendering the identification of the firearm inadmissible on that ground alone. The judge also found that the detectives made "repeated affirmative and confirmatory statements" that likely "hindered Johnson's ability to make an uninfluenced identification," and rendered the identification inadmissible under the common law of evidence as "unreliable, unfair, and prejudicial."

The defendant and the Commonwealth each applied for interlocutory review of the adverse ruling.  The single justice allowed both applications, and we granted the defendant's application for direct appellate review.

Discussion.  1.  Motion to suppress Johnson's identification of defendant.  a.  Failure to follow protocol. In Silva-Santiago, 453 Mass. at 797-798, we set forth a protocol to be used before a photographic array is provided to an eyewitness.  Under the protocol, police must make clear to an eyewitness that "he [or she] will be asked to view a set of photographs; the alleged wrongdoer may or may not be in the photographs depicted in the array; it is just as important to clear a person from suspicion as to identify a person as the wrongdoer; individuals depicted in the photographs may not appear exactly as they did on the date of the incident because features such as weight and head and facial hair are subject to change; regardless of whether an identification is made, the investigation will continue."  The protocol also "requires the administrator to ask the witness to state, in his or her own words, how certain he or she is of any identification."  Id. at 798.  We declined to hold that the absence of such a protocol or comparable warnings in the identifications made in the Silva-Santiago case required that they be found inadmissible, but we

declared that "we expect" such a protocol "to be used in the future."  Id.

    That expectation has largely been met.  A joint survey conducted in 2013 by the Massachusetts Chiefs of Police Association and the New England Innocence Project identified 253 police departments that had policies regarding identification procedures, and eighty-five per cent of these policies "incorporated reform protocols."  Massachusetts Chiefs of Police Association & Massachusetts Major City Chiefs, A Response to the Final Report of the President's Task Force on 21st Century Policing 13 (Sept. 2015), available at http://www.masschiefs. org/files-downloads/news-1/866-mcopa-mmcc-response-to-the-final-report-of-the-president-s-task-force-on-21st-century-police/file [https://perma.cc/D4K5-EALZ].  See Supreme Judicial Court Study Group on Eyewitness Evidence:  Report and Recommendations to the Justices 103-104 (July 25, 2013), available at http://www.mass.gov/courts/docs/sjc/docs/eyewitness-evidence-report-2013.pdf [https://perma.cc/WY4M-YNZN].  In fact, this is the first case where the identification procedure was conducted after we announced the protocol in Silva-Santiago in which we have been asked to consider what consequence, if any, should arise from the failure to follow the protocol.  And, even here, the detectives followed the protocol where they showed Johnson photographs and asked her to identify anyone she recognized who

was among the group of people that were the apparent target of the defendant's gunfire; they failed to follow the protocol only where they showed her the array that included the defendant.

The expectation we declared in Silva-Santiago was not intended as a prediction of future police conduct; it was meant as a warning that the failure to follow such a protocol may have consequence where the prosecution intends to offer an identification at trial that is procured without the benefit of such a protocol. See Silva-Santiago, 453 Mass. at 798, citing Commonwealth v. Diaz, 422 Mass. 269, 273 (1996) ("warning 'that the time may come when recording in places of detention . . . will be mandatory if a statement obtained during custodial interrogation is to be admissible'"). The superintendence authority of this court does not extend to law enforcement agencies; we cannot mandate what they must or must not do, but we can mandate what the consequence will be in a court of law where they fail to follow our guidance. See Commonwealth v. DiGiambattista, 442 Mass. 423, 444-445 (2004) ("The issue . . . is not what we 'require' of law enforcement, but how and on what conditions evidence will be admitted in our courts. We retain as part of our superintendence power the authority to regulate the presentation of evidence in court proceedings").

We have recognized "that the failure to provide warnings comparable to the protocol we adopted in Silva-Santiago . . .

'substantially increases risk of misidentification.'" Commonwealth v. Walker, 460 Mass. 590, 602 (2011), quoting Report of Special Master at 22 (June 18, 2010), State vs. Henderson, N.J. Supreme Court, No. A-8-08. Moreover, as part of our model jury instructions on eyewitness identification, 473 Mass. 1051, 1056-1057 (2015), we instruct juries to evaluate an identification "with particular care" where the police failed to follow the Silva-Santiago protocol during the identification procedure, which reflects our recognition that there is a near consensus in the relevant scientific community that the failure to follow such a protocol increases the risk of misidentification. See Commonwealth v. Gomes, 470 Mass. 352, 366-367 (2015) ("a principle is 'so generally accepted' that it is appropriate to include in a model eyewitness identification instruction where there is a near consensus in the relevant scientific community adopting that principle"). See also id. at 367 n.24.

Therefore, the consequence of a failure to follow the Silva-Santiago protocol is twofold: it affects a judge's evaluation of the admissibility of the identification; and, where it is found admissible, it affects the judge's instructions to the jury regarding their evaluation of the accuracy of the identification.

As to admissibility, under art. 12 of the Massachusetts Declaration of Rights, an identification of a defendant must be suppressed where the defendant proves by a preponderance of the evidence that "the witness was subjected by the State to a pretrial confrontation . . . 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to deny the defendant due process of law." Commonwealth v. Odware, 429 Mass. 231, 235 (1999), quoting Commonwealth v. Otsuki, 411 Mass. 218, 232 (1991). In making this determination, the judge must examine the totality of the circumstances regarding the interaction between the witness and the police. Odware, supra, quoting Otsuki, supra at 232-233. Because the failure to follow the protocol needlessly increases the risk of a misidentification, an identification procedure without such a protocol is unnecessarily suggestive. See Commonwealth v. Figueroa, 468 Mass. 204, 217 (2014), quoting Commonwealth v. Phillips, 452 Mass. 617, 628 (2008) ("Even where there is 'good reason' for a showup identification, it may still be suppressed if the identification procedure so needlessly adds to the suggestiveness inherent in such an identification that it is 'conducive to irreparable mistaken identification'"); Walker, 460 Mass. at 604 ("all-suspect array significantly and needlessly increases the potentially unjust consequences that may arise from a false positive identification"). But that

alone does not mandate its suppression, because the standard, to be judged based on the totality of the evidence of the police interaction with the witness, is whether the identification procedure was "'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to deny the defendant due process of law" (emphasis added).  Odware, supra, quoting Otsuki, supra at 232.

In considering the degree of suggestiveness arising from the failure to follow the protocol, a judge may consider the witness's familiarity with the alleged wrongdoer.  The level of familiarity between a witness and the suspect is measured by factors such as the number of times the witness viewed the suspect previously; the duration, nature, and setting of those encounters; and the period of time over which the encounters occurred.  People v. Rodriguez, 79 N.Y.2d 445, 450-451 (1992). Where a witness saw the wrongdoer for the first time during the commission of the crime, the witness will examine a photographic array in search of the unknown person he or she saw during that incident.  But where, as here, the witness was familiar with the alleged wrongdoer from prior interactions and knew his first name, the witness will look at a photographic array in search of that person.  We cannot reasonably expect the witness to ignore her memory of what the person looked like based on prior interactions and focus only on what the person looked like

during the commission of the crime.  Cf. <u>Commonwealth</u> v.
<u>Crayton</u>, 470 Mass. 228, 242 (2014) ("there may be 'good reason'
for the first identification procedure to be an in-court showup
where the eyewitness was familiar with the defendant before the
commission of the crime"; in this circumstance, "the in-court
showup is understood by the jury as confirmation that the
defendant sitting in the court room is the person whose conduct
is at issue rather than as identification evidence").

To be sure, the witness might have been mistaken in
thinking that the person she saw committing the crime was the
person she knew; research has shown that the perception of
familiarity is often unreliable.  See Model Jury Instructions on
Eyewitness Identification, 473 Mass. at 1054 endnote h, citing
Pezdek & Stolzenberg, Are Individuals' Familiarity Judgments
Diagnostic of Prior Contact?, 20 Psychol. Crime & L. 302, 306
(2014) ("twenty-three per cent of study participants
misidentified subjects with unfamiliar faces as familiar, and
only forty-two per cent correctly identified familiar face as
familiar").  And we do not agree with the Commonwealth that the
use of the protocol here "would not have provided any additional
safeguards" because of Johnson's familiarity with "Marcus."  The
photographic array potentially could have revealed that the
"Marcus" she knew was a different "Marcus" from the person the
police included in the array, or that her actual familiarity

with "Marcus" was less than the modest familiarity she described.  But we conclude that, where a witness believes he or she knows the perpetrator from prior interactions and knows the perpetrator's name, the risk of misidentification arising from the failure to follow the protocol is less than where the witness looks at an array in search of an unknown person he or she saw only during the commission of the crime.  Although the motion judge here did not do so, a judge properly may consider this familiarity in determining, based on the totality of the circumstances, whether the failure to follow the protocol was so unnecessarily suggestive as to deprive the defendant of due process.  We conclude that, in these circumstances, the detectives' failure to follow the protocol, standing alone, did not warrant suppression of Johnson's identification of the defendant.

b.  <u>Simultaneous versus sequential photographic array</u>.  The defendant contends that the detectives' failure to adhere to the <u>Silva</u>-<u>Santiago</u> protocol was not the only source of needless suggestiveness, and that the identification procedure was unnecessarily suggestive because the eleven photographs in the array were shown to Johnson simultaneously rather than sequentially.

We have twice examined the scientific arguments in support of sequential arrays.  In <u>Silva</u>-<u>Santiago</u>, 453 Mass. at 798-799,

we acknowledged the debate among scholars and practitioners
whether the sequential showing of photographs yields more
accurate identification, and concluded that, "[w]hile that
debate evolves, the choice of a simultaneous rather than a
sequential display of photographs shall go solely to the weight
of the identification, not to its admissibility."  In Walker,
460 Mass. at 601, we revisited that conclusion and noted that
the empirical research suggests that the rate of both accurate
and inaccurate (i.e., true and false positive) identification is
higher where eyewitnesses are shown a simultaneous array rather
than an sequential array.  We declared:

> "What is not clear from the studies is whether, and in what
> circumstances, the use of the protocol in a simultaneous
> photographic lineup diminishes the risk of false positive
> identification to a rate comparable to or less than that in
> a sequential lineup.  We cannot determine whether a
> sequential display is superior to a simultaneous display
> and that the use of the latter is unnecessarily suggestive
> until we learn, at a minimum, whether the rate of false
> positive identification with the use of the protocol is
> significantly higher in simultaneous displays than in
> sequential displays."

Id. at 602.  We therefore concluded that "it is still too soon
to conclude that sequential display is so plainly superior that
any identification arising from a simultaneous display is
unnecessarily suggestive and therefore must be suppressed."  Id.
at 602-603.  See State v. Henderson, 208 N.J. 208, 257-258
(2011) ("For now, there is insufficient, authoritative evidence

accepted by scientific experts for a court to make a finding in favor of either [simultaneous or sequential lineup] procedure").

A recent study was the first of its kind to compare the accuracy of identifications arising from the display of simultaneous and sequential arrays during identification procedures conducted by police officers in the field where the witnesses received a warnings protocol and the administering officer did not know which photograph depicted the suspect. Wells, Steblay, & Dysart, Double-Blind Photo Lineups Using Actual Eyewitnesses:  An Experimental Test of a Sequential Versus Simultaneous Lineup Procedure, 39 Law & Hum. Behav. 1, 10 (2015).[8]  The study's findings were consistent with findings in comparable nonfield studies in that eyewitnesses were more likely to identify the suspect in a simultaneous array than in a sequential array, but they were also more likely to identify someone who was known to be innocent.[9]  Although this study

---

[8] The data set for this study consisted of 494 identification procedures conducted in actual criminal cases by police departments in Charlotte-Mecklenburg, North Carolina; Tucson, Arizona; San Diego, California; and Austin, Texas. Wells, Steblay, & Dysart, Double-Blind Photo Lineups Using Actual Eyewitnesses:  An Experimental Test of a Sequential Versus Simultaneous Lineup Procedure, 39 Law & Hum. Behav. 1, 4 (2015) (Wells, Steblay, & Dysart).  The witnesses were presented with six photographs, including one suspect and five "known-innocent fillers," in either a simultaneous or sequential array. Id. at 2, 11.

[9] Witnesses identified a suspect 1.5 per cent more often after viewing a simultaneous rather than a sequential array

suggests the modest superiority of sequential arrays to simultaneous arrays, other researchers have argued in favor of the simultaneous array based on a form of statistical analysis traditionally used in medical diagnostics. See Amendola & Wixted, Comparing the Diagnostic Accuracy of Suspect Identifications Made by Actual Eyewitnesses from Simultaneous and Sequential Lineups in a Randomized Field Trial, 11 J. Experimental Criminology 263, 263 (2015); Carlson & Carlson, An Evaluation of Lineup Presentation, Weapon Presence, and a Distinctive Feature Using ROC Analysis, 3 J. Applied Res. in Memory & Cognition 45, 45 (2014); Mickes, Flowe, & Wixted, Receiver Operating Characteristic Analysis of Eyewitness Memory: Comparing the Diagnostic Accuracy of Simultaneous Versus Sequential Lineups, 18 J. Experimental Psychol.: Applied 361, 361 (2012).

---

(27.5 per cent versus 26.0 per cent), a difference that is not statistically significant. Wells, Steblay, & Dysart, supra at 8. Over-all, witnesses selected photographs of known-innocent fillers more often in simultaneous displays than in sequential displays (17.8 per cent to 12.3 per cent), but this difference was not statistically significant. Id. However, if we look only at those witnesses who made an identification, 42 per cent chose a known-innocent filler with the simultaneous array procedure and 31 per cent chose a known-innocent filler with the sequential array procedure, and this difference is statistically significant. Id. at 10, 12. The authors noted the high error rate of identification in their study and "found the performance of these witnesses to be quite poor regardless of the procedure used." Id. at 12.

In 2014, the National Academy of Sciences, based on its review of the scientific research, speaking of sequential versus simultaneous display, concluded that "the relative superiority of competing identification procedures . . . is unresolved," and recommended that "caution and care be used when considering changes to any lineup procedure, until such time as there is clear evidence for the advantages of doing so."  National Research Council of the National Academies, Identifying the Culprit:  Assessing Eyewitness Identification 3, 104, 118 (2014).  The Department of Justice, in a memorandum dated January 6, 2017, from Deputy Attorney General Sally Q. Yates, entitled "Eyewitness Identification:  Procedures for Conducting Photo Arrays," at 8, reviewed the relevant research and concluded that, until additional research is conducted, "it is not possible to say conclusively whether one identification method [simultaneous or sequential] is better than the other." We would not conclude that sequential display is the better procedure and that the use of a simultaneous display is unnecessarily suggestive unless there were a near consensus in the relevant scientific community to support such a conclusion. Gomes, 470 Mass. at 366-367.  Where there is not, the decision whether to use a simultaneous or a sequential procedure is best

left to law enforcement, and the choice will continue to bear on the weight of the identification, but not on its admissibility.[10]

Because the failure to follow the Silva-Santiago protocol in these circumstances was not sufficient alone to warrant a finding that the identification procedure was so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny the defendant due process of law, and because the use of the simultaneous display was not unnecessarily suggestive, we affirm the judge's denial of the defendant's motion to suppress Johnson's identification of the defendant.

2. Motion to suppress Johnson's identification of firearm. The Commonwealth contends that the judge erred in suppressing Johnson's identification of the firearm after finding that the showing of a single photograph of a firearm to Johnson in the absence of exigent circumstances constituted a denial of due process. Before evaluating this claim of error, we offer some perspective regarding the judge's decision.

The judge suppressed Johnson's identification of the firearm as the firearm the defendant used to fire at the

---

[10] Our model jury instructions on eyewitness identification direct juries to "evaluate the identification with particular care" where the police fail to follow a protocol that is established or recommended by the law enforcement agency conducting the identification procedure. 473 Mass. 1051, 1056-1057 (2015). A defendant may request such an instruction where a police department that has chosen the sequential method fails to employ it in an identification procedure.

bystanders from the back seat of the vehicle where Johnson was a front seat passenger. We do not understand the judge's decision to bar her from testifying at trial to the description of the firearm she provided to the detectives before they showed her the photograph: that the firearm was big and black and looked like the firearm carried by the detectives. Moreover, the judge provided an alternative ground for finding Johnson's identification to be inadmissible based on our common law of evidence: that the probative value of her identification was substantially outweighed by the unfair prejudice arising from the detectives' questioning, which suggested that the firearm in the photograph was the firearm she had seen, and their subsequent statements, which confirmed her belief that it was the same firearm after she responded to their suggestions. See Commonwealth v. Simmons, 383 Mass. 46, 51-52 (1981), S.C., 392 Mass. 45, cert. denied, 469 U.S. 861 (1984) ("Even if constitutional considerations did not apply, an appropriate rule of evidence might require that an identification of an inanimate object not be admitted in evidence where the government used a highly suggestive identification procedure because the unfair, prejudicial, and unreliable quality of the identification would outweigh its probative value"). See also Commonwealth v. Carter, 475 Mass. 512, 518 (2016), quoting Commonwealth v. Johnson, 473 Mass. 594, 599 (2016) ("Even if otherwise

admissible, a judge may suppress identification evidence if 'its probative value is substantially outweighed by the danger of unfair prejudice'"). The judge's evidentiary decision is reviewed under an abuse of discretion standard, where we ask "whether the judge's decision resulted from 'a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives.'" Commonwealth v. Kolenovic, 471 Mass. 664, 672 (2015), quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

The judge did not abuse his discretion in ruling the identification inadmissible under the common law of evidence. During the first interview, Johnson told the detectives that she did not see the firearm until the defendant leaned out the rear driver's side window and began firing, that she ducked when the shooting started, and that she did not know whether the gun was in the defendant's hand when he left the vehicle immediately after the shooting. As noted, her description of the firearm provided no detail that would suggest that she could identify anything more than its type. During the second interview, she was shown the photograph of the firearm immediately after she was again asked to describe the gun. She initially said, "That's probably it," but moments later asked, "Is this the gun?" The only identifying detail she noted on the firearm were

"little scratches," but she had said nothing earlier about seeing any scratches and the judge reasonably could have doubted that she could have seen them while the defendant was firing the weapon or clearing its jam.[11]  Where the identification of the firearm was unreliable, and where the witness's confidence in the identification was inflated by the detectives' confirmatory statements, the judge acted well within the bounds of discretion in ruling the identification inadmissible.  See Johnson, 473 Mass. at 600 ("The danger of unfair prejudice arises because the accuracy of an identification tainted by suggestive circumstances is more difficult for a jury to evaluate"); Simmons, 383 Mass. at 51-52.

Having affirmed the judge's ruling on evidentiary grounds, we now address the judge's due process analysis.  In Simmons, 383 Mass. at 51, we recognized that, "in an extreme case, the degree of suggestiveness of an identification procedure concerning an inanimate object might rise to the level of a denial of due process."  We also recognized that there are three differences between the out-of-court identification of a defendant and an out-of-court identification of an inanimate object.  Id. at 52.  First, the "chances of fundamental

_____

[11] The photograph was briefly displayed for the video camera but we were unable to discern "little scratches" on the firearm from the videotaped recording, and the Commonwealth did not offer the photograph in evidence or include it in the record on appeal.

unfairness" are greater where a defendant is identified because that "directly tends to prove the case against him," but "[i]dentification of tangible property is only indirect proof of the defendant's guilt, even though its force may be most persuasive in certain instances." Id. Second, most tangible objects "are not unique," but "[t]here is only one person with the physical characteristics of the defendant." Id. Third, "[a] lineup of people is practical," but "[a] lineup of property may not be." Id. We therefore rejected "the notion that a lineup of inanimate objects is required in circumstances where a lineup of people would be required." Id. See Commonwealth v. Bresilla, 470 Mass. 422, 427, 431 (2015) (although identification of jacket worn by shooter was strong evidence that defendant was shooter, "Commonwealth was not required to create a photographic array of jackets").

Due process may be denied by admitting in evidence an identification of an inanimate object where, first, the police knew or reasonably should have known that identification of the object effectively identifies the defendant as the perpetrator of the crime and where, second, the police needlessly and strongly suggested to the witness that the object is the object at issue. See Simmons, 383 Mass. at 51-52. Cf. Commonwealth v. Spann, 383 Mass. 142, 148 (1981) ("Barring an extreme case of suggestiveness, perhaps involving improper statements by the

police in the course of such a procedure, a motion to suppress the photographic identification of a victim need not be allowed").  By recognizing that the identification procedure used to identify an inanimate object may implicate due process, we do not suggest that the identification procedure need be the same as the procedure used to identify a suspect; we have already made clear that a lineup of similar objects is not required even in the absence of a showing of exigency, and the judge erred in ruling otherwise.  See Bresilla, 470 Mass. at 431; Simmons, supra at 52.  Where the judge rested his finding of a denial of due process solely on the failure of the police to use a photographic array of similar firearms, that finding cannot be sustained.

However, because the identification of an inanimate object potentially may implicate due process, and because under our common law of evidence the probative value of any such identification must not be substantially outweighed by unfair prejudice, the police should take reasonable steps to avoid unnecessary suggestiveness in what will generally be a showup procedure, that is, the showing of the object alone or a single photograph of the object.  A police protocol would be valuable in guarding against needless suggestiveness in identification procedures involving an inanimate object and in ensuring that the fact finder learns with precision the nature of any

identification by the witness.  We urge police departments to devise such a protocol for the identification of inanimate objects where such an identification would persuasively inculpate a defendant.

The identification protocol we adopted in our opinion in Silva-Santiago had been recommended to law enforcement authorities by the United States Department of Justice.  453 Mass. at 798, citing United States Department of Justice, Eyewitness Evidence:  A Guide for Law Enforcement 19, 31-32, 33-34 (1999).  But that protocol was created for the identification of a suspect in a lineup or a photographic array; it was not designed for a showup identification of an inanimate object.  To our knowledge, no protocol for the identification of inanimate objects has yet been devised by the Department of Justice or by any Federal, State, or local law enforcement agency, so it is prudent for us to tread carefully here.  We invite police departments to consider, in devising such a protocol, whether it should include the following elements:  (1) the witness should be asked to provide a verbal description of the object before the object or a photograph of the object is shown to the witness; (2) the officer should tell the witness that the object that will be shown to the witness may or may not be the object the witness described; (3) where any identification is made, the officer should ask the witness to state, in his or her own

words, how certain he or she is of the identification; and (4) the officer should obtain clarification from the witness as to whether the object is the actual object he or she saw, or whether it simply looks like the object he or she saw. The identification procedure should be memorialized, preferably by a contemporaneous videotape or audio recording but alternatively by an interview report timely prepared.

Conclusion. For the reasons stated above, we affirm the denial of the defendant's motion to suppress Johnson's identification of him, and the allowance of the defendant's motion to suppress Johnson's identification of the firearm.

So ordered.