## COMMONWEALTH vs. JASON DERAMO.[1]

Plymouth. October 4, 2001. - February 8, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Motor Vehicle,* Habitual traffic offender, Operating under the influence. *Search and Seizure,* Threshold police inquiry. *Constitutional Law,* Search and seizure, Reasonable suspicion. *Threshold Police Inquiry. Evidence,* Criminal records, Authentication.

At a hearing on a motion to suppress evidence obtained as a result of an allegedly unlawful stop of the defendant for operating a motor vehicle after his license had been revoked for operating while under the influence of alcohol, the judge correctly denied the motion, where the arresting officer had reasonable suspicion to stop the vehicle, based on his observance of the defendant's vehicle and his knowledge that the defendant's license had, as of two months earlier, still been subject to two lengthy periods of revocation. [41-45]

At the trial of a criminal complaint charging the defendant with operating a motor vehicle after his license had been revoked for operating while under the influence of alcohol, the judge erred in admitting a portion of copies of records from the registry of motor vehicles that did not bear an original attestation from the registry and differed from the records sent to the court under the proper original attestation; however, in the circumstances, the error was not prejudicial, and there was ample evidence, properly admitted, to support the defendant's conviction. [45-52]

COMPLAINT received and sworn to in the Wareham Division of the District Court Department on March 6, 1998.

A pretrial motion to suppress evidence was heard by *Rosemary B. Minehan,* J., and the case was heard by *James M. Quinn,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*George W. Skogstrom, Jr.,* for the defendant.

*Christina L. Crowley,* Assistant District Attorney, for the Commonwealth.

---

[1]As is our custom, we use the defendant's name as it appears in the complaint. See *Commonwealth* v. *Rodriquez,* 418 Mass. 1, 1 n.1 (1994).

SOSMAN, J. Following a jury-waived trial, the defendant was convicted of operating a motor vehicle after his license had been revoked for operating while under the influence of alcohol (G. L. c. 90, § 23, second par.). On appeal, he contended that the motion judge erred in denying his motion to suppress evidence obtained as a result of an allegedly unlawful stop. He also contended that the trial judge erroneously admitted in evidence copies of registry of motor vehicles (registry) records without the authentication required by G. L. c. 233, § 76, and that, without the erroneously admitted records, there was insufficient evidence to support the conviction. The Appeals Court affirmed the conviction in an unpublished memorandum and order pursuant to its rule 1:28. 50 Mass. App. Ct. 1112 (2001). We granted the defendant's application for further appellate review. We now conclude that the motion to suppress was properly denied. While we agree with the defendant that a portion of the registry records was erroneously admitted, the error was not prejudicial, and there was ample evidence, properly admitted, to support the conviction. We therefore affirm.

1. *Motion to suppress.*[2] In January, 1998, Officer John Mulready of the Carver police department was dispatched to the defendant's garage in response to a reported break-in. While there, Mulready overheard another officer ask the defendant how he had come to work that day. In response, the defendant pointed to a gray Ford F150 pickup truck with distinctive silver door handles. Later that day, Mulready ran a check on the truck's registration. He learned that the truck was registered to the defendant and that the defendant's license had been revoked. Specifically, he learned that there were two separate license revocations then in effect, a two-year revocation imposed in October, 1996, for operating while under the influence of alcohol, and a four-year revocation imposed in December, 1996, for the defendant's record as a habitual traffic offender (G. L. c. 90, § 22F).

On March 6, 1998, Mulready was on patrol on Route 44 in Carver. He observed a gray Ford F150 pickup truck go by, and

---

[2]The summary of facts is based on the motion judge's findings, supplemented with undisputed testimony from the evidentiary hearing. See *Commonwealth* v. *Torres*, 433 Mass. 669, 670 (2001).

recognized the unusual door handles that he had previously seen on the defendant's vehicle. Based on the information he had obtained back in January concerning the defendant's license revocations, Mulready stopped the vehicle to make inquiry concerning the status of the defendant's license. As Mulready went up to the driver's side door, the defendant made an incriminating statement concerning the status of his license.[3] Mulready arrested the defendant for operating a motor vehicle after his license had been revoked. At no time prior to the stop did Mulready perform a current check of the status of the defendant's license. A subsequent check confirmed that the defendant's license was still revoked.

The defendant contends that Mulready lacked the requisite reasonable suspicion to effectuate the stop, and that all evidence obtained as a result of that stop should have been suppressed.[4] In order to effectuate a stop for purposes of a threshold inquiry, the police must have "a reasonable suspicion, based on specific, articulable facts and reasonable inferences, that the defendant had committed, was committing, or was about to commit a crime." *Commonwealth* v. *Willis*, 415 Mass. 814, 817 (1993). Here, based on his observation of the defendant's vehicle and his knowledge that the defendant's license had, as of two months earlier, still been subject to two lengthy periods ·of

---

[3]At the hearing on the motion to suppress, Mulready testified that the defendant first said, "I'm just trying to get to work, why me?" At trial, after refreshing Mulready's recollection with his report of the incident, Mulready testified that the defendant also said that "he had an appointment to meet with his lawyer to get a Cinderella license" so he could drive to and from work.

[4]The only evidence obtained as a result of the stop was (1) Mulready's confirmation of the identity of the operator of the vehicle, and (2) the statements made by the defendant when Mulready came up to the driver's door (see note 3, *supra*). While the defendant also argues that there was no probable cause for his arrest, the evidence in question had already been obtained by way of the stop immediately prior to the actual arrest. Even where police misconduct occurs, the exclusionary rule does not result in the suppression of evidence that was obtained prior to that misconduct. See *Commonwealth* v. *Marquez*, 434 Mass. 370, 376-377 (2001) (statements of defendant and police observation of mountain bike in defendant's apartment not suppressed even though defendant's subsequent warrantless arrest was improper). Here, there was no further evidence obtained as a product of the arrest itself, and hence nothing further to be suppressed. Accordingly, we will consider the legality of the stop of the defendant's vehicle and will not analyze separately the legality of the defendant's subsequent arrest.

revocation, Mulready reasonably suspected that the defendant was committing the crime of operating a motor vehicle without a valid license.

The defendant argues that, prior to the stop, Mulready recognized only the vehicle, not the driver, and that mere identification of the vehicle did not give rise to a reasonable suspicion that the defendant was operating the vehicle. At the motion hearing, Mulready testified that he identified the defendant prior to making the stop.[5] The defendant's argument is premised on the fact that, at trial, Mulready's testimony omitted this particular detail, and the defendant suggests that Mulready's trial testimony somehow eviscerates his testimony at the motion hearing. We disagree. Having successfully established the basis for the stop at the evidentiary hearing on the motion to suppress, the Commonwealth was not required to reestablish the basis for the stop at trial. "Moreover, in reviewing a judge's ruling on a motion to suppress, an appellate court 'may not rely on the facts as developed at trial' even where the testimony differed materially from that given at trial." *Commonwealth* v. *Grandison*, 433 Mass. 135, 137 (2001), quoting *Commonwealth* v. *Garcia*, 34 Mass. App. Ct. 386, 391-392 (1993).

Even if Mulready had recognized only the vehicle without making a specific identification of the defendant prior to the stop, courts have held that the police may, in the absence of any contrary evidence, reasonably conclude that a vehicle is likely being driven by its registered owner. See, e.g., *Lake in the Hills* v. *Lloyd*, 227 Ill. App. 3d 351, 352-353 (1992); *State* v. *Pike*, 551 N.W.2d 919, 922 (Minn. 1996); *State* v. *Halvorson*, 299 Mont. 1, 4-5 (2000); *State* v. *Richter*, 145 N.H. 640, 641-642 (2000). We agree. While it is certainly possible that someone other than a vehicle's registered owner may be operating the

---

[5]When asked what he observed, Mulready answered, "I observed a gray pick-up truck. Also observed the driver, recognizing him as Jason Deramo." Defense counsel cross-examined Mulready on this issue, pointing out that his identification of the driver prior to the stop had not been included in his report of the incident. The motion judge did not make any express finding on this point, but "[t]he judge's denial of the defendant's motion implies resolution of factual issues in favor of the Commonwealth . . . ." *Commonwealth* v. *Lanoue*, 392 Mass. 583, 586 n.2 (1984), *S.C.*, 400 Mass. 1007 (1987), and 409 Mass. 1 (1990).

vehicle on any given occasion, the likelihood that the operator is the owner is strong enough to satisfy the reasonable suspicion standard. See *Lake in the Hills* v. *Lloyd, supra* at 353, citing *People* v. *Barnes*, 152 Ill. App. 3d 1004, 1006 (1987).

The defendant also contends that Mulready's recollection of the records he had seen two months earlier did not justify any inference that the defendant's license was still revoked, and that Mulready should have performed a current license check prior to making the stop. As of January, 1998, Mulready knew that the defendant was still subject to a two-year revocation that had been imposed back in October, 1996. That revocation was to continue until October, 1998, and thus would still be in effect as of the March 6, 1998, date on which Mulready saw the defendant operating a vehicle. As of January, 1998, Mulready also knew that the defendant had another revocation in effect, a four-year habitual traffic offender revocation that had been imposed in December, 1996. That revocation would not expire until December, 2000, a date long beyond the March 6, 1998, date of this stop.

However, the defendant points out that, during the two months that had elapsed since Mulready checked on the status of his license, his license might have been reinstated for some reason (e.g., on grounds of hardship), and that Mulready's information from two months earlier would not rule out that possibility. The standard of "reasonable suspicion" does not require that an officer exclude all possible innocent explanations of the facts and circumstances. While it was possible that some relief might have been accorded to the defendant between January, 1998, and March, 1998,[6] it was reasonable for Mulready to suspect that some form of license suspension was still in effect

---

[6] Under G. L. c. 90, § 22F, an habitual traffic offender may apply for a limited license on "the sole grounds of hardship" after completing one year of the mandatory four-year license revocation. As of December 22, 1997, the defendant became eligible to apply for such a hardship license. It was, however, purely discretionary with the Registrar of Motor Vehicles (registrar) whether and on what conditions to grant any such limited license. We note, moreover, that the defendant had previously been deemed an habitual traffic offender and had had his license revoked on that ground back in 1989. After regaining his license prior to the expiration of the required four years (apparently on grounds of hardship), he proceeded to commit a wide variety of further motor vehicle infractions, ultimately leading to yet another four-year

when he observed the defendant operating his motor vehicle in March, 1998. See *State* v. *Leyva*, 599 So. 2d 691, 693 (Fla. Dist. Ct. App. 1992) (reasonable for officer to suspect that defendant's license still suspended where officer had checked status of license four to five weeks prior to stop); *State* v. *Harris*, 236 Ga. App. 525, 526-527 (1999) (information that license was suspended obtained within "few weeks" of stop); *State* v. *Duesterhoeft*, 311 N.W.2d 866 (Minn. 1981) (officer's knowledge of license suspension from check performed one month earlier provided reasonable suspicion for stop); *State* v. *Yeargan*, 958 S.W.2d 626, 633 (Tenn. 1997) (officer who had been present when defendant's license was suspended for one year had reasonable suspicion to stop defendant when he saw defendant driving six months later). Cf. *Boyd* v. *State*, 758 So. 2d 1032, 1034-1036 (Miss. Ct. App. 2000) (knowledge that defendant's license had been suspended eight years earlier, in absence of any evidence concerning length of that suspension, did not support reasonable suspicion that license was still suspended).

We thus conclude that Mulready had reasonable suspicion to stop the defendant's vehicle, and that the motion judge correctly denied the defendant's motion to suppress.

2. *Admission of registry records, G. L. c. 233, § 76.* Prior to trial, and again during trial, the defendant objected to the introduction of copies of records from the registry on the ground that the copies did not bear an original attestation from the registry and that those copies differed from the records sent to the court under the proper original attestation. Specifically, the clerk had on file a set of records from the registry that bore an original attestation dated July 16, 1998. However, the prosecutor had, by way of the Carver police, a set of records with a certification date of March 24, 1998, but the attestation on that set was not itself an original. The police had apparently copied a set that they had previously obtained from the registry and sent that copy to the prosecutor, but the police did not produce

revocation as a habitual traffic offender. The defendant's history of chronic and serious infractions of motor vehicle laws, a pattern of violations that continued unabated following the return of his license from a prior habitual traffic offender revocation, is such that he would be an extremely poor candidate for yet another hardship license.

the copy bearing an original attestation that they had obtained from the registry.[7] Thus, the set of registry records that the prosecutor wished to introduce bore a copy of the attestation from the Registrar of Motor Vehicles (registrar), but not an original attestation, while the clerk's set, sent to the court seven weeks prior to trial, bore an original attestation.

For reasons that are unexplained, there was one relevant difference between the copy of registry records in the clerk's file and the copy sought to be introduced by the prosecutor. The prosecutor's set contained a copy of a notice dated October 17, 1996, which notified the defendant of the revocation of his license for "DWI Liquor." However, the clerk's set of records, while it contained copies of other notices sent to the defendant, did not contain the October 17, 1996, notice. Both sets, however, contained a computer printout of the defendant's driving history, and both printouts bore an entry dated October 17, 1996, reflecting "Revocation DWI Liquor 2 Years," and an entry reflecting "DWI Liquor Plymouth G" from the Wareham District Court with a "Finding Date" of October 3, 1996. Thus, both versions of the registry's printout demonstrated that the defendant had been convicted on October 3, 1996, of operating a motor vehicle while under the influence of alcohol, and that that conviction had resulted in a two-year revocation of his license on October 17, 1996.[8] What was missing from the original attested set, but present in the set proffered by the prosecutor, was a copy of the notice to the defendant advising him of the October 17, 1996, license revocation for driving while under the influence of alcohol.

The defendant argued that, under G. L. c. 233, § 76, copies of registry records could not be admitted in evidence unless they bore the original attestation of the registrar, and, therefore,

[7] In order to avoid issues on appeal, the judge suggested to the prosecutor that she simply obtain a current attested version directly from the registry. For reasons that are not explained on this record, the prosecutor did not do so.

[8] Both copies also reflected a four-year license revocation, imposed on December 12, 1996, for the defendant's record as a habitual traffic offender, and both sets of records contained a December 12, 1996, notice to the defendant with respect to that habitual traffic offender revocation. That notice specified that the habitual traffic offender revocation was for "an additional [four] years" effective December 22, 1996.

any items in the set proffered by the prosecutor that were not in the properly authenticated set in the clerk's office should not be admitted in evidence. The statute provides as follows: "Copies of books, papers, documents and records in any department of the commonwealth or of any city or town, authenticated by the attestation of the officer who has charge of the same, shall be competent evidence in all cases equally with the originals thereof . . . ."[9] G. L. c. 233, § 76. See G. L. c. 90, § 30 (certified copies of registry records "attested by the registrar or his authorized agent, shall be admissible as evidence in any court of the commonwealth to prove the facts contained therein"); Mass. R. Crim. P. 40 (a) (1), 378 Mass. 917 (1979) (official records kept within the Commonwealth may be authenticated "by a copy attested by the officer having legal custody of the record, or by his deputy").

"The method of authenticating official written statements is almost always a matter of some precision. Statutes are specific in their requirements, and these requirements — involving attestations, certificates, affidavits, and seals — are rigidly insisted upon." P.J. Liacos, Massachusetts Evidence § 8.13.3, at 545-546 (7th ed. 1999). Under G. L. c. 233, § 76, as under G. L. c. 90, § 30, and rule 40 (a) (1), authentication of a copy of an official record requires that the officer in charge of keeping the original record "attest" to the authenticity of the copy. "[A]n 'attested' copy of a document is one which has been examined and compared with the original, with a certificate or memorandum of its correctness, signed by the persons who have examined it." Black's Law Dictionary 127-128 (6th ed. 1990). Thus, to qualify as an "attested" copy, there must be "a written and signed certification that it is a correct copy." *Henderson* v. *United States*, 778 F. Supp. 274, 277 (D.S.C. 1991). "[T]he attestation of an official having custody of an official record 'is the assurance given by the certifier that the copy submitted is accurate and genuine as compared to the original.' " *People* v. *Smith*, 258 A.D.2d 245, 250 (N.Y. 1999), quoting *People* v. *Brown*, 128 Misc. 2d 149, 154 (N.Y. County Ct. 1985).

---

[9]For most departments, the genuineness of the officer's signature must itself be attested by the Secretary of the Commonwealth under seal or, for municipal agencies, by the clerk of the city or town. G. L. c. 233, § 76. The registry was exempted from this additional requirement by St. 1988, c. 101.

By definition, an official cannot "attest" to the accuracy or completeness of a copy that the official has never seen and that the official's agency did not produce. Thus, when a party takes a properly authenticated copy of an official record and then makes his own copy of it, the official whose attestation is required has not "attested" to the authenticity of that later copy. Merely making a copy of the original attestation along with a copy of the underlying record does not serve the purpose of the attestation requirement, as the copied attestation no longer signifies that the official in question is vouching for the authenticity of the copy that has just been made. See *Kelly* v. *State*, 561 N.E.2d 771, 773 (Ind. 1990), citing *Yung Jin Teung* v. *Dulles*, 229 F.2d 244 (2d Cir. 1956) ("a photostatic duplicate of a certification authenticating document copies does not provide certification necessary for proper authentication, and the document copies are not admissible"). See also *People* v. *Smith*, *supra* (certification preprinted onto blank page does not serve to authenticate information that is later printed on the page, as "the document provides no assurances that any comparison has been made between the copy and the original record").

The requirement that the responsible official be the one to attest to the authenticity of a copy is not some minor technicality. The cover page of a stack of copied records may bear an original attestation, but that original attestation, once having been copied, can be attached to anything. Whether through inadvertence, mechanical error, or deliberate tampering, another copy of the official record may no longer be identical to the copy that the officer authenticated, and a mere reproduction of the attestation does nothing to confirm the authenticity, accuracy, or completeness of the copy to which it is then attached. We reject arguments to the effect that the accuracy of modern photocopying technology makes such attestation requirements unnecessary. Rather, "the ease with which documents may be made to appear genuine by the use of modern technology" only serves to underscore the need for proper attestation. *Mimick* v. *United States*, 952 F.2d 230, 231 (8th Cir. 1991). "Even in this day when modern copying equipment can produce copies so speedily, the requirement of attestation still serves a useful purpose in assuring that the copy which comes out of the machine so

quickly is complete, legible and unaltered." *Winter* v. *Casco Bank & Trust Co.*, 396 A.2d 1020, 1022 (Me. 1979).

In the present case, the registrar never attested to the copy of the defendant's driving record that had been made by the Carver police. While he apparently attested to a copy that his office provided to the police, he did not attest to any further copies of those documents that the police then made. Indeed, there were discrepancies between the properly authenticated copy that the clerk had on file and the copy that the prosecutor had obtained from the Carver police, and no explanation was provided for those discrepancies. Strict adherence to the requirements of attestation, including that the attestation pertain to the precise copy to which it is affixed, is intended to avoid this sort of confusion and error. The defendant's objection to the introduction of a copy of what purported to be his records from the registry, without the original attestation of the registrar or the registrar's agent, should have been sustained.

We now turn to whether the erroneous admission of the unauthenticated copy of the registry record resulted in any prejudice to the defendant. Because the error was preserved, we must determine whether the error was nonprejudicial. *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998). Where, as here, the parties and the judge have themselves compared an authenticated record with a copy, the copy may be admitted to the extent that it is identical to the authenticated document. See Proposed Mass. R. Evid. 901 (b) (3) (authentication requirement may be satisfied through "[c]omparison by the trier of fact or by expert witnesses with specimens which have been authenticated"). Here, almost all of the items in the exhibit as introduced were identical to the items in the properly authenticated set of registry records in the clerk's file. The defendant acknowledged (both before the trial judge and on appeal) that the only relevant difference between the properly authenticated registry records and the copy that lacked proper authentication was the October 17, 1996, notice addressed to the defendant. That particular notice, because it did not exist in the properly authenticated set of records, should have been redacted from the exhibit. Thus, the only aspect of the judge's error that was potentially prejudicial was the inclusion of the October 17, 1996, notice as part of the exhibit.

The issue, then, is whether the improper inclusion of that notice letter prejudiced the defendant. It did not. To prove the crime of operating a motor vehicle after revocation or suspension of license for operating while under the influence of alcohol, G. L. c. 90, § 23, second par., the Commonwealth must prove the following: (1) that the defendant operated a motor vehicle; (2) that at the time of that operation the defendant's license was revoked or suspended; (3) that the license suspension or revocation was pursuant to a violation of one of the specified statutory sections (including operating a motor vehicle while under the influence of alcohol in violation of G. L. c. 90, § 24 [1] [*a*]); and (4) that the defendant was notified that his license had been suspended or revoked. See *Commonwealth* v. *Blake*, 52 Mass. App. Ct. 526, 528 n.3 (2001), citing Model Jury Instructions for Use in the District Court § 5.13 (1989).

The defendant argues that the erroneously admitted October 17, 1996, notice was "crucial" to establishing the final two elements, namely, that the revocation of his license was for driving while under the influence of alcohol and that he received notice of the license revocation. We disagree. From other entries in the properly authenticated set of registry records it was clear that the defendant's license had been revoked for operating a motor vehicle while under the influence of alcohol. An entry reflecting license revocation for "DWI Liquor" appears on the registry's chronological listing of the defendant's driving history, as does an entry reflecting the underlying conviction of the offense of operating a motor vehicle while under the influence of alcohol.[10] These entries established that the defendant's license had been revoked for operating while under the influence of alcohol, without resort to the information contained in the notice of that revocation.

As to the issue of notice, we recognize that that element is ordinarily established by proof of mailing of the notice from the registry. See *Commonwealth* v. *Koney*, 421 Mass. 295, 303-304 (1995); *Commonwealth* v. *Crosscup*, 369 Mass. 228, 239-240

---

[10]The record entries also reflect the defendant's previous assignment to an alcohol treatment program to resolve a 1993 charge of operating while under the influence of alcohol, and his 1996 conviction would therefore mandate a two year revocation of his license under G. L. c. 90, § 24 (1) (*b*) and (*c*) (2).

(1975); *Commonwealth* v. *Blake, supra* at 528; *Commonwealth* v. *Lora*, 43 Mass. App. Ct. 136, 143-144 (1997). In the absence of any properly introduced copy of the notice, and in the absence of any certification from the registry that that notice was sent,[11] the Commonwealth did not prove proper mailing of the notice concerning the revocation of the defendant's license for operating while under the influence of alcohol. However, what the Commonwealth did prove was the defendant's actual knowledge that his license was revoked. The judge noted that the defendant's statement to the officer, claiming that he was going to see his attorney to get a "Cinderella license," constituted an admission that he knew that his license had been revoked.[12] There was also much circumstantial evidence from which the defendant's knowledge of the license revocation could be inferred.[13] As we explained in *Commonwealth* v. *Crosscup, supra* at 230-231, 233, 236, the Commonwealth is not required to show actual notice or actual knowledge; rather, the notice ele-

---

[11]The cover page containing the registrar's attestation includes a certification that all attached notices were mailed to the address set forth on each notice. However, where the October 17, 1996, notice was not contained in the properly authenticated set of records, the certification concerning mailing did not apply to that notice.

[12]The officer testified that the term "Cinderella license" refers to a license that the registrar may issue on grounds of hardship so that the operator may, despite a revoked or suspended license, drive to and from work. See G. L. c. 90, § 24 (1) (*c*) (1), (2), (3) and (3 1/2); G. L. c. 90, § 22F.

[13]The printout of the defendant's driving history confirms that the defendant was convicted in the Wareham District Court on October 3, 1996, of operating while under the influence of alcohol, and contains an entry of "License Suspended" in court on that same date. Such a conviction results in the automatic revocation of the defendant's license, and "[s]uch revoked license shall immediately be surrendered to the prosecuting officer who shall forward the same to the registrar." G. L. c. 90, § 24 (1) (*b*). From the mandatory surrender of his license on conviction, the defendant had to be aware that his license had been suspended as a result of his conviction of operating while under the influence of alcohol. Then, the registry records confirmed his subsequent habitual traffic offender license revocation, and his conviction of operating while under the influence was one of the predicate violations that triggered that December 22, 1996, habitual traffic offender revocation. See G. L. c. 90, § 22F. The properly authenticated set of registry records contained the notice of the habitual traffic offender revocation, advising the defendant that his license had been revoked for "an additional [four] years." Finally, there is an entry dated July 2, 1997, noting that a copy of the registry's record was sent to the defendant himself on that date. These circumstances, coupled with the defendant's own acknowledgment that he was seeking a "Cinderella

ment may be satisfied merely by showing that the registry's notice procedures were followed such that the defendant could, with reasonable diligence, acquire knowledge of the suspension. See *Commonwealth* v. *Lora, supra* (argument that registry sent notice to incorrect address rejected because defendant himself was required to furnish registry with correct address). Where, as here, the defendant's actual knowledge of license revocation has been proved by his own admission, there is no further requirement that the Commonwealth prove precisely how that actual knowledge was acquired. In substance, the Commonwealth proved a level of notice higher than that which it was required to prove, even without proper introduction of a copy of the actual notice from the registry. As such, the evidence of the defendant's guilt was overwhelming, and we are satisfied that the erroneous admission of the October 17, 1996, notice was harmless.

*Judgment affirmed.*

license," establish beyond a reasonable doubt that the defendant had actual knowledge that his license had been revoked.