NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

16-P-1681                                         Appeals Court

COMMONWEALTH  vs.  BRADLEY McEVOY.


No. 16-P-1681.

Essex.     November 13, 2017. - June 4, 2018.

Present:  Kinder, Desmond, & Sacks, JJ.


Motor Vehicle, Leaving scene of accident, License to operate.
     Registrar of Motor Vehicles, Records, Revocation of license
     to operate.  License.  Notice.  Constitutional Law,
     Confrontation of witnesses, Identification.  Evidence,
     Photograph, Identification.  Identification.  Practice,
     Criminal, Confrontation of witnesses, Instructions to jury.



     Complaints received and sworn to in the Lynn Division of
the District Court Department on July 15 and September 6, 2013.

     A pretrial motion to suppress evidence was heard by Michael
C. Laurenzano, J., and the cases were tried before Ellen
Flatley, J.


     Kevin P. DeMello for the defendant.
     Ronald DeRosa, Assistant District Attorney, for the
Commonwealth.


     SACKS, J.  After a District Court jury trial, the defendant

was convicted of leaving the scene of an accident causing both

personal injury and property damage and of operating a motor

vehicle with a suspended license.[1]  On appeal, the defendant

claims that (1) admission in evidence of the registry of motor

vehicles' (registry) "mailing confirmation" document related to

his notice of license suspension violated the confrontation

clause and was erroneous on other grounds, (2) the Commonwealth

offered insufficient evidence to prove that he had notice of his

license suspension, (3) his motion to suppress the victim's

pretrial identification of him from a photographic array was

erroneously denied, and (4) the judge improperly omitted a

portion of the Gomes jury instruction addressing eyewitness

identification under high stress.  See Commonwealth v. Gomes,

470 Mass. 352, 381-382 & n.9 (2015) (Appendix).  We affirm.

Background.  The jury could have found that on July 3,

2013, Andres Santana was operating his motorcycle in Lynn, when

a sport utility vehicle (SUV) pulled out from a side street to

make a turn.  Unexpectedly, however, a green sedan pulled out

immediately behind the SUV and then stopped in Santana's travel

lane, forcing him to brake.  Santana saw the driver of the sedan

for about a second and observed that he was wearing a white tank

top and that his left arm was tattooed.  Anticipating that the

---

[1] He was also convicted of operating a motor vehicle that
was uninsured and had a suspended registration, but those
charges were placed on file with his consent, and his claims of
error regarding those charges are not before us.  Absent
exceptional circumstances, convictions of charges placed on file
with the defendant's consent cannot be appealed.  See
Commonwealth v. Delgado, 367 Mass. 432, 438 (1975).

sedan might proceed forward, Santana tried to steer to the right and rear of the sedan to avoid a collision. The driver, however, stared directly at Santana, "ma[king] perfect eye contact," and momentarily froze.

Santana's motorcycle struck the sedan's driver's side rear quarter panel, propelling him into the air and over the sedan. He hit the road and rolled underneath a stopped vehicle, and by the time he stood up, he could not see the sedan. He received medical treatment and his motorcycle was later declared a total loss.

A Lynn police officer arrived and spoke with Santana. The officer also found a bumper, with the license plate attached, in the intersection. A few hours later, the officer was dispatched to a street less than a mile away where a 1997 green Geo Prism sedan was found parked. The Prism had damage to the rear driver's side and matched the license plate left in the intersection. The defendant was the registered owner of the Prism.

Two days later, on July 5, the defendant reported to the Lynn police that his Prism had been stolen. He stated that the theft occurred sometime between July 3 and 5, from a street corner in Lynn, and that the keys were in the vehicle and the doors locked. Further police investigation showed that, prior to the date of the collision, the defendant's operator license

had been suspended and the insurance and registration for the Prism had been revoked.

Lynn police Officer John Meaney attempted to locate the defendant. On July 11, he went to the address in Peabody listed for the defendant in the registry's records. There was no answer at the door, but the Prism was in the driveway.[2] Officer Meaney noticed damage to the rear quarter panel but saw no damage to the windows, ignition, or steering column.

Several days later, the defendant telephoned Officer Meaney and said that he had brought the sedan to Lynn and parked it there sometime on July 3. The defendant explained that he always left a key under the mat and denied any involvement in the collision.

The police prepared a photographic array that included a picture of the defendant, and on August 15, Officer Meaney showed Santana the array. Santana identified the defendant's photograph as that of the driver. Santana also told Officer Meaney that the driver had tattoos, although they were not visible in the photograph.[3] Santana later identified the

---

[2] Nothing in the record explains how or when the Prism, after being found on a street in Lynn the day of the collision and being reported stolen two days later, was returned to the defendant's driveway.

[3] The photographs in the array showed only the upper shoulders and head of each individual. The defendant's memorandum in support of his motion to suppress asserted that

defendant in court as the driver.  The defense theory, advanced through cross-examination and argument, was misidentification.

Discussion.  1.  Registry mailing confirmation.  The defendant raises three challenges to the Commonwealth's use at trial of a registry mailing confirmation document to prove that he received notice of his license suspension.  He argues that use of the document violated the confrontation clause -- both because it was created for use at trial and because it was used to prove an element of the crime -- and that it was not properly authenticated.

To prove the charge, the Commonwealth was required to show, among other things, that the defendant had been notified that his license was suspended or revoked.  See G. L. c. 90, § 23; Commonwealth v. Deramo, 436 Mass. 40, 50 (2002); Commonwealth v. Parenteau, 460 Mass. 1, 5-6 (2011)  "Pursuant to G. L. c. 90, § 22(d),[4] the Commonwealth can satisfy this burden by showing

---

the tattoos "do not in fact exist exactly as described" by Santana to Officer Meaney.  There was no testimony at the motion hearing or trial regarding whether or how the defendant was tattooed.

[4] The relevant portion of G. L. c. 90, § 22(d), as amended by St. 1969, c. 637, provides:

"Notice to any person whose license or registration certificate or right to operate is suspended or revoked under this section or notice to any person of intention to revoke or suspend his license or registration certificate under this section shall be in writing, shall be mailed by the registrar or any person authorized by him . . . and a

that the registry properly mailed the notice of suspension or revocation, which constitutes 'prima facie evidence of receipt by the addressee.'" Id. at 6, quoting from Commonwealth v. Koney, 421 Mass. 295, 303-304 (1995). See Commonwealth v. Royal, 89 Mass. App. Ct. 168, 174 n.9 (2016).

To meet this burden, the Commonwealth introduced a copy of a May 10, 2013, notice addressed to the defendant, informing him that his license would be suspended effective June 9, 2013 (about one month before the July 3 collision). The notice bore the designation: "USPS ID: 370853." The Commonwealth also introduced a registry document entitled "USPS MAILING CONFIRMATION." The mailing confirmation also bore the designation "USPS ID: 370853,"[5] and included the statements, "CREATED BY RMV ON: 05/10/2013" (the same date as the notice), and "RECEIVED BY USPS: 05/13/2013 20:09, AT POST OFFICE: 02205." The documents were certified by the registrar of motor vehicles (registrar) under G. L. c. 90, § 22.

---

certificate of the registrar that such notice has been mailed in accordance with this section shall be deemed prima facie evidence and shall be admissible in any court of the commonwealth as to the facts contained therein."

[5] This "USPS ID" number was different from the one appearing on the notice that the Prism's registration had been suspended and its corresponding mailing confirmation, permitting the inference that each notice and corresponding mailing confirmation are assigned a different USPS ID number.

a. Confrontation clause: purpose for record's creation. The defendant first argues that the mailing confirmation was inadmissible under Parenteau, 460 Mass. 1, because it was created for the purpose of use at trial. In Parenteau, the Commonwealth had introduced a copy of the notice of license revocation together with the registrar's attested statement that the notice had been mailed on the date shown on the notice. See id. at 4. The attestation was dated two months after the related criminal complaint had issued. See id. at 8. The court held that the attestation document was testimonial because the date showed that it had been produced specifically for use at the defendant's trial. See id. at 8-9. The court concluded that the document's "admission at trial in the absence of testimony from a registry witness" violated the defendant's confrontation rights. Id. at 9.

In reaching this conclusion, the Parenteau court relied on Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), as outlining the particular characteristics that render business records, if admitted without live testimony, violative of the confrontation clause. Under Melendez-Diaz, "business records are not admissible at trial 'if the regularly conducted business activity is the production of evidence for use at trial.'" Parenteau, 460 Mass. at 9, quoting from Melendez-Diaz, 557 U.S. at 321. As an illustration, in Melendez-Diaz, the Court quoted

from Palmer v. Hoffman, which held that "an accident report provided by an employee of a railroad company did not qualify as a business record because, although kept in the regular course of the railroad's operations, it was 'calculated for use essentially in the court, not in the business.'" Melendez-Diaz, 557 U.S. at 321, quoting from Palmer v. Hoffman, 318 U.S. 109, 114 (1943). "[B]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because -- having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial -- they are not testimonial." Parenteau, 460 Mass. at 9, quoting from Melendez-Diaz, 557 U.S. at 322-324.

Applying these principles, the Parenteau court held that the registrar's attestation of mailing, created for use at trial, was inadmissible because it was not "a contemporaneous business record." Id. at 10. Importantly, however, the court explained that, "If such a record had been created at the time the notice was mailed and preserved by the registry as part of the administration of its regular business affairs, then it would have been admissible at trial." Ibid.

In response to Parenteau, the registry implemented a system to create such contemporaneous records, and we upheld their

admissibility against a confrontation clause challenge in Royal, 89 Mass. App. Ct. at 174. We concluded:

> "The mailing confirmation records introduced in this case appear to be such contemporaneous business records, now maintained by the registry in response to the Parenteau decision. They were properly admitted as evidence that the registry mailed, and prima facie evidence that the defendant received, the notices of intent to suspend his license."

The defendant here nevertheless presses the claim that the mailing confirmations are testimonial because they were not created for any business purpose but instead "were created in the wake of the Parenteau case for the sole purpose of allowing the Commonwealth to prove notice of suspensions and revocations at trial without the use of live testimony." Our decision in Royal already rejected this argument, concluding that the mailing confirmations, created in response to the roadmap in Parenteau for avoiding a confrontation clause problem, did in fact avoid that problem. See ibid. The court would not have laid out such a roadmap if it led only to a dead end.

In assessing the purpose for the creation of the mailing confirmations, we are guided by Commonwealth v. Zeininger, 459 Mass. 775, cert. denied, 565 U.S. 967 (2011) -- a decision issued shortly before Parenteau -- in which the court held admissible certain State office of alcohol testing (OAT) records annually certifying the proper functioning of breathalyzer machines used to test operating under the influence (OUI)

suspects' blood alcohol content. By statute, the results of a breathalyzer test are inadmissible in a prosecution for OUI unless the breathalyzer has received an annual certification from OAT that it meets certain accuracy criteria. See id. at 779-780, citing G. L. c. 90, § 24K. And, because a "notation of [such annual] certification appears on the same report as the results of the breathalyzer test, as a matter of practice, it is admitted in evidence and published to the jury in an OUI prosecution." Id. at 780-781.

The defendant in Zeininger argued that the OAT certification was inadmissible because "even if a record is prepared in the regular course of business, it does not qualify as a business or official record . . . if it was 'calculated for use essentially in the court, not in business.'" Id. at 784, quoting from Melendez-Diaz, 557 U.S. at 321. The Supreme Judicial Court concluded that "the OAT certification records are not 'calculated for use essentially in the court.'" Id. at 784, quoting from Palmer, 318 U.S. at 114.

> "Rather, OAT prepares the certification records in concert with its statutory charge to administer an internal regulatory program that standardizes 'satisfactory methods, techniques and criteria for the conduct of [breathalyzer] tests.' G. L. c. 90, § 24K. In this sense the records are 'typical of entries made systematically or as a matter of routine to . . . provide internal controls,' which are admissible under the Federal rules and the common law."

Ibid., quoting from Palmer, 318 U.S. at 113. The OAT records were thus admissible as business records.

In Zeininger, the court then turned to, and rejected, the confrontation clause challenge to the OAT certification records. Notwithstanding that the obvious purpose of breathalyzers is to accurately test the blood alcohol levels of OUI suspects, and to provide accurate evidence against those charged with OUI, the court reasoned that "the OAT certification records were made 'for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial,'" and thus were nontestimonial. Id. at 787, quoting from Melendez-Diaz, 557 U.S. at 324. See Michigan v. Bryant, 562 U.S. 344, 358 (2011).

Much of what the court said in Zeininger applies equally to the registry's mailing confirmations. The registry has a statutory duty to notify persons that their operators' licenses have been suspended or revoked. See, e.g., G. L. c. 90, § 22(d); G. L. c. 90C, § 3(A)(6)(a). The registry must preserve records of such notices, as well as other documents "maintained in the normal course of business." G. L. c. 90, § 30, as amended by St. 2010, c. 409, § 14. The primary purpose of registry mailing confirmations is to "guarantee, internally, as a matter of course, and when necessary, in court," that the registry has performed its statutory duty of giving notice of

license suspensions and revocations. Zeininger, 459 Mass. at 788.

In Zeininger, the court stated that "[a]t the time of [OAT's] certification, the hypothetical use of that record in an as-yet-unknown criminal proceeding [was] merely an ancillary purpose, subordinate in importance to the 'administration of the entity's affairs.'" Id. at 788, quoting from Melendez-Diaz, 557 U.S. at 324. Here, likewise, the hypothetical use of the registry's mailing confirmation in an as-yet-unknown prosecution for operating under suspension is equally ancillary to the registry's statutory duty, regulatory in character, to suspend or revoke operators' licenses in order to protect public safety. See Luk v. Commonwealth, 421 Mass. 415, 423-430 (1995) (registry's license suspension or revocation serves primarily regulatory, not punitive function).

Further, in Zeininger, 459 Mass. at 788, the court distinguished OAT technicians from chemists (like those in Melendez-Diaz), who create certificates of drug analysis, on the ground that OAT technicians act with no particular prosecutorial purpose. The court adopted the reasoning of the Oregon Court of Appeals on this point:

> "Although [breathalyzer machines] produce evidence that is used only in criminal prosecutions or administrative hearings, the person who performs the test of a machine's accuracy does so with no particular prosecutorial use in

> mind, and, indeed, there is no guarantee that the machine
> will ever, in fact, be used."

Zeininger, 459 Mass. at 788 n.18, quoting from State v. Bergin,
231 Or. App. 36, 41 (2009). Likewise, the registry employees
who cause mailing confirmations to be created have no particular
prosecutorial use in mind, and there is no guarantee that any
given mailing confirmation will ever be used in court.

We acknowledge that the court's ruling in Zeininger rested
in part on its conclusion that OAT certification records were
not "offered as direct proof of an element of the offense
charged," but instead "bear only on the admissibility or
credibility of the [breathalyzer] evidence." Zeininger, 459
Mass. at 786. OAT certification records "bear a more attenuated
relationship to conviction: They support one fact (the accuracy
of the machine) that, in turn, supports another fact that can
establish guilt (blood alcohol level)." Id. at 787, quoting
from Bergin, 231 Or. App. at 41. Here, although a registry
mailing confirmation may constitute more direct proof of an
element of the offense,[6] we cannot say that Zeininger therefore

---

[6] The mailing of notice by the registry is not itself an
element of the offense; rather, such mailing is ordinarily
offered as prima facie proof of the element that the defendant
received notice of the license suspension or revocation. See
Commonwealth v. Crosscup, 369 Mass. 228, 231, 239-242 (1975);
Deramo, 436 Mass. at 50-51; Parenteau, 460 Mass. at 6.
Moreover, proof of mailing by the registry is not essential;
proof of "the defendant's actual knowledge that his license was
revoked" will suffice, even without proof of "precisely how that

precludes its use.  This is because after the decision in
Zeininger, the court in Parenteau, despite expressly recognizing
that a mailing confirmation could be used as "prima facie
evidence . . . [of] an essential element of the charged crime,"
Parenteau, 460 Mass. at 8, indicated that a contemporaneously
created mailing confirmation would be admissible.  See id. at
10.  In short, Zeininger and Parenteau, read together, require
the conclusion that the use at trial of the registry's
contemporaneously produced mailing confirmation did not violate
the confrontation clause.

b.  Confrontation clause:  use of record to prove element
of offense.  The defendant next argues that the confrontation
clause bars the use of an otherwise admissible business record
to prove an element of an offense -- here, that he had notice
that his operator's license had been suspended.[7]  As just noted,
the Parenteau court implicitly rejected this argument; we
explicitly rejected it in Commonwealth v. Weeks, 77 Mass. App.
Ct. 1 (2010).  There, a defendant was charged with carrying a

_____

actual knowledge was acquired."  Deramo, 436 Mass. at 51-52.
See Commonwealth v. Oyewole, 470 Mass. 1015, 1016 (2014)
(suggesting that notice element could be satisfied by proof that
suspension was communicated to defendant by judge in open court
or that docket sheet reflecting suspension was shown to
defendant).

[7] For purposes of this argument we assume that the defendant
is correct in characterizing the registry's mailing of notice as
proving an element of the offense.  But see note 6, supra.

firearm without a license, subsequent offense; we held that certified copies of the docket sheets showing the prior convictions were nontestimonial and admissible to prove those convictions, which were plainly an element of the subsequent-offense charge at issue. Id. at 1, 5-8. See Commonwealth v. Ellis, 79 Mass. App. Ct. 330, 331-333 (2011) (same in OUI subsequent-offense prosecution). Similarly, in Kirby v. United States, 174 U.S. 47 (1899), the Court recognized that it does not violate the confrontation clause to use a docket sheet to prove the fact of a prior conviction, where that fact is necessary to a subsequent prosecution. Id. at 54-55.

c. Authentication. Equally unavailing is the defendant's argument that the mailing confirmation was not properly authenticated. The suspension notice and mailing confirmation were attached to an attestation from the registrar, which were signed by her, stating that the "annexed instrument(s) are true copy(s) of the . . . notice(s) of suspension/revocation as appearing in the registrar's records." This was sufficient.

That the attestation did not specifically mention the mailing confirmation is not dispositive. Neither of the statutes making attested copies of registry records admissible -- G. L. c. 233, § 76, and G. L. c. 90, § 30 -- specifies the precise form an attestation must take. See Commonwealth v. Martinez-Guzman, 76 Mass. App. 167, 170, 172 n.4 (2010). See

also G. L. c. 233, § 78. The defendant does not dispute that the attestation was physically attached to the notice and mailing confirmation, and the mailing confirmation can reasonably be viewed as a component of the notice as appearing in the registrar's records, even if the mailing confirmation itself is not mailed to the operator along with the notice. Cf. Commonwealth v. Dias, 14 Mass. App. Ct. 560, 563-564 (1982). The requirement that, "to qualify as an 'attested' copy, there must be 'a written and signed certification that [the document] is a correct copy,'" was satisfied. Deramo, 436 Mass. at 47, quoting from Henderson v. United States, 778 F. Supp. 274, 277 (D.S.C. 1991).

2. Sufficiency of evidence that notice was sent. Contrary to the defendant's argument, the mailing confirmation contained sufficient details, as outlined supra, from which a jury could reasonably infer that the registry mailed the suspension notice to the defendant. See Royal, 89 Mass. App. Ct. at 174. This constituted prima facie evidence that the defendant received the notice. See Parenteau, 460 Mass. at 6. This case is thus nothing like Commonwealth v. Oyewole, 470 Mass. 1015 (2014), relied upon by the defendant, where there was no evidence that the defendant had been notified, in writing or orally, of his license suspension. See id. at 1016-1017.

3. Motion to suppress photographic array identification. The defendant argues that the motion judge erred in denying, after an evidentiary hearing, the motion to suppress Santana's identification of the defendant in the photographic array. The defendant maintains that the identification was so unnecessarily suggestive as to violate constitutional principles and was unreliable under common-law fairness principles. We disagree.[8]

a. Constitutional principles. In moving to suppress, the defendant had the burden to prove "by a preponderance of the evidence that the identification was 'so unnecessarily suggestive and conducive to irreparable misidentification that its admission would deprive the defendant of his right to due process.'" Commonwealth v. Johnson, 473 Mass. 594, 597 (2016), quoting from Commonwealth v. Walker, 460 Mass. 590, 599 (2011). "In considering whether identification testimony should be suppressed, the judge must examine 'the totality of the circumstances attending the confrontation to determine whether it was unnecessarily suggestive.'" Ibid., quoting from Commonwealth v. Silva-Santiago, 453 Mass. 782, 795 (2009).

---

[8] The defendant further argues that, because Santana's identification based on the photographic array should have been suppressed, his in-court identification should also have been excluded, because it did not meet the independent-source standard as reiterated in Commonwealth v. Johnson, 473 Mass. 594, 602 (2016). Because we conclude that the suppression motion was properly denied, we need not reach the latter issue.

The defendant asserts six separate flaws in the photographic array identification process. As the relevant facts are undisputed, we review, without deference to the motion judge, the application of the law to those facts. See id. at 602.

First, Officer Meaney, because he knew which photograph was that of the suspect (i.e., the defendant) and also presented the array to Santana, did not follow the "double-blind procedure" recognized as the "better practice" in Silva-Santiago, 453 Mass. at 797. But here, as in Silva-Santiago, "there was no evidence that the [officer] who presented the photographic arrays signaled a particular response to, or otherwise attempted to influence," the witness. Ibid. In these circumstances, the absence of a double-blind procedure went to weight, not admissibility. See ibid.

Second, the defendant asserts that Officer Meaney failed to follow the Lynn police department's eyewitness identification procedures, in that he did not obtain a description of the suspect before presenting the photographic array to Santana. But the procedures do not require such a step. They assume, but do not require, that a witness description will be used in order to select "fillers" for the array; they do not make a suspect's resemblance to a previously-obtained description the only permissible basis for including that suspect's photograph in an

array. Here, the bumper and license plate left at the scene pointed to the defendant (the Prism's owner) as a logical suspect,[9] and once his photograph was obtained from the registry, photographs of similar-looking persons, from the same source, were used to fill out the array. We see nothing unnecessarily suggestive in this process.

Third, the defendant's claim that the other photographs in the array depicted persons with significantly lighter skin than his is not borne out by the color copy of the array in the record. See id. at 795 (array not unnecessarily suggestive where it included photographs of individuals with "reasonably similar features and characteristics").

Fourth, that the photographs were shown simultaneously rather than sequentially[10] goes to weight rather than admissibility, because there is no near consensus in the scientific community regarding which method is more reliable. See Commonwealth v. Thomas, 476 Mass. 451, 463-464 (2017). The

---

[9] This suspicion was bolstered by the defendant's report that his locked Prism had been stolen, combined with Officer Meaney's observations that the Prism parked in the defendant's driveway eight days after the collision had no damage to the windows, ignition, or steering column, although its rear quarter panel was damaged.

[10] Santana actually described a hybrid procedure in which he looked at each photograph as Officer Meaney placed it in front of him on a table, until there were six photographs in front of him; after looking at all of them for another thirty seconds, he chose the defendant's photograph.

defendant points out that Lynn police department procedures call for the array to be shown sequentially, "one at a time."  As the Thomas court said, however,

> "[The] model jury instructions on eyewitness identification direct juries to 'evaluate the identification with particular care' where the police fail to follow a protocol that is established or recommended by the law enforcement agency conducting the identification procedure. . . .  A defendant may request such an instruction where a police department that has chosen the sequential method fails to employ it in an identification procedure.

Thomas, 476 Mass. at 464 n.10, quoting the Model Jury Instructions on Eyewitness Identification, 473 Mass. 1051, 1056-1057 (2015) (model instructions).  Here, the judge gave that "particular care" instruction twice in her final charge.[11]

Fifth, the defendant argues that Officer Meaney, by telling Santana that the photograph he had chosen was that of "the registered owner of the car," gave "confirmatory feedback [that] artificially inflate[d] [the] eyewitness's level of confidence in his . . . identification."  Commonwealth v. Collins, 470 Mass. 255, 263 (2014).  But Officer Meaney's testimony that he made this statement was elicited not at the suppression hearing, but only later, at trial.  "Evidence adduced at trial but not before the motion judge . . . cannot be determinative of the

_____

[11] We cite Thomas and the model instructions for convenience, while recognizing that the judge at the trial here, in June, 2015, did not yet have the benefit of the model instructions and was working instead from the provisional instructions appended to the decision in Gomes, 470 Mass. 352, 385-386 (Appendix).

propriety of the motion judge's decision." Commonwealth v. Ramos, 402 Mass. 209, 216 (1988). In any event, it is far from clear that the statement inflated Santana's confidence in his identification. Officer Meaney testified at the hearing that after Santana chose the defendant's photograph and said "that's the person who was driving the car," the officer asked Santana "how sure he was, and he replied that he was positive." And Santana testified at the hearing that he was "sure" of his identification from the photograph.

Sixth and finally, the defendant notes that, contrary to Lynn police procedures, Officer Meaney did not preserve the photographs from the array or make high quality copies of them; instead, he took a color photograph of the entire array, and that photograph was admitted in evidence at the suppression hearing and at trial. The defendant has not argued, however, that this departure from procedure diminished the accuracy of Santana's identification or furnished any other ground for suppression. Moreover, as noted, the jury were instructed to evaluate "with particular care" an identification not made in accordance with established procedures.

b. Common-law fairness principles. The defendant also argues that the identification should have been excluded under common-law fairness principles, because various factors made it so minimally probative that its value was substantially

outweighed by the danger of unfair prejudice arising from the assertedly suggestive circumstances in which it was made.  See Johnson, 473 Mass. at 598-602; Commonwealth v. Dew, 478 Mass. 304, 315-316 (2017).  The defendant notes that Santana had never seen the Prism's driver before the collision, Santana saw him only very briefly,[12] and some time elapsed between the collision and Santana's photographic array identification.[13]  See id. at 316 (listing witness's prior familiarity with person identified, opportunity to observe offender at time of crime, and amount of time between crime and identification as factors to be considered).  The defendant bears the burden of proof by a preponderance of the evidence, and we review the judge's ruling for abuse of discretion.  See Johnson, 473 Mass. at 599, 602.

---

[12] The defendant also argues, for the first time on appeal, that Santana's opportunity to observe the driver was diminished, and thus his identification was less reliable, because Santana was under high stress just before the collision.  See Gomes, 470 Mass. at 372, 380.  Even if such high stress was present here and is a factor to be considered in the common-law test, but see Dew, 478 Mass. at 316, it did not, even in combination with the other factors the defendant cites, render the identification so unreliable as to make its admission an abuse of discretion.

[13] The defendant also argues, for the first time on appeal, that his dark skin created a risk of cross-racial or cross-ethnic misidentification.  See Commonwealth v. Bastaldo, 472 Mass. 16, 27-30 (2015), decided after the trial in this case, announcing a prospective rule regarding an instruction on cross-racial identifications.  Here, the sole indication of race in the record is a report created by Officer Meaney, within a week after Santana was shown the photographic array, listing the defendant's race as "white" and Santana's as "unknown."

Here, Santana was able to directly observe the driver during daylight, for long enough to observe what he was wearing, that his left arm was tattooed, and the expression on his face. Santana was sufficiently collected to attempt to steer around the Prism. Although Santana had never seen the driver before, and did not identify him from the photographic array until some weeks after the collision, against these factors detracting from the identification's probative value must be balanced the minimal evidence, discussed supra, that the identification was suggestive. The motion judge was not required to conclude that the identification's probative value was substantially outweighed by the danger of unfair prejudice. He did not abuse his discretion in denying the motion to suppress on this basis.

4. Jury instruction. The defendant argues that it was error to omit that portion of the provisional identification instruction appended to Gomes, 470 Mass. at 381-382 (Appendix), relating to high stress, and providing as follows:

> "You should also consider characteristics of the witness when the observation was made, such as the quality of the witness's eyesight, whether the witness knew the offender, and, if so, how well, and whether the witness was under a high degree of stress -- high levels of stress, compared to low to medium levels, can reduce an eyewitness's ability to accurately perceive an event" (emphasis added; footnotes omitted).

Because the defendant did not object to this omission, we review to determine whether any error created a substantial risk

of a miscarriage of justice.[14]  See Commonwealth v. Keevan, 400 Mass. 557, 564 (1987).  As the record does not disclose the reason for the judge's omission, we assume without deciding that it was error, but we conclude that it did not create a substantial risk of a miscarriage of justice.

The omitted language informs the jury that a high degree of stress can reduce accurate observations, but it does not require the jury to conclude that high stress does so, and the jury could have concluded otherwise here.[15]  Nor does the language instruct the jury on how to distinguish between "high" levels of stress and "medium" levels, which may actually enhance perception, see Gomes, 470 Mass. at 382 n.9 (Appendix), or "low" levels of stress.  Defense counsel forcefully pointed out how

---

[14] Before closing arguments, the defendant requested the Gomes instruction; the judge replied that she would give it, but that parts of it were not required, and she would give those parts she thought relevant.  After her charge, the judge asked if the parties had "requests for additions, corrections, or objections"; defense counsel replied that she had none.  "[W]hen a judge agrees to give a requested instruction . . . any claim of error in the adequacy of the instruction must be preserved for appellate review by a postcharge objection."  Commonwealth v. Arias, 84 Mass. App. Ct. 454, 463 (2013).

[15] The jury could have determined from Santana's testimony describing the defendant's arm position, clothing, facial expression, and tattoos, as well as Santana's detailed description of the various measures he considered and took to avoid the collision and injury to himself, that whatever level of stress Santana was experiencing did not appear to have impaired his ability to accurately perceive the events.

stressful the incident must have been in her closing, arguing

that Santana had:

> "One second to observe. . . .  Mr. Santana's life flashed
> before his eyes . . . .  He was downshifting to a different
> gear.  He knows a crash is imminent.  He's approaching
> quickly to the car.  He's trying to swerve his bike out of
> the way.  He hits the rear quarter panel and is ejected
> from his motorcycle. . . .  He [re]lied on a one-second
> observation?  . . .  I would suggest to you that you could
> not."

In addition, another portion of the judge's instruction

correctly conveyed a closely related principle to the jury:

> "You the jury must decide whether the witness'
> identification is accurate.  Consider the witness'
> opportunity to observe the offender at the time of the
> offense; how good a look the witness had of the
> offender, the degree of attention the witness was
> paying to the offender at the time, the distance
> between the witness and the offender . . . and the
> length of time the witness had to observe the
> offender."[16]

That the defendant, despite having requested the Gomes

instruction, did not object when invited to do so at the

conclusion of the charge, see note 14, supra, further suggests

that the omission was not prejudicial.  See Commonwealth v.

Lucien, 440 Mass. 658, 664-665 (2004) (absence of objection

weighs against defendant's claim of prejudice).  For all of

these reasons, "we conclude that there is no substantial risk

---

[16] We do not mean to suggest that this portion of the instruction, which was also drawn from the Gomes provisional instruction, 470 Mass. at 380, and appears in different form in the Model Jury Instructions, 473 Mass. at 1054, is a substitute for the high-stress instruction.

that [any error in] the judge's instruction . . . may have materially influenced the verdict in this case, and therefore no substantial risk of a miscarriage of justice."  Commonwealth v. Shea, 467 Mass. 788, 797 (2014).

Judgments affirmed.