NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

16-P-1470                                    Appeals Court

COMMONWEALTH  vs.  DOMINICK R. ALVES.

No. 16-P-1470.

Plymouth.     January 4, 2019. - November 20, 2019.

Present:  Green, C.J., Vuono, Meade, Rubin, & Wolohojian, JJ.[1]

Constitutional Law, Jury.  Jury and Jurors.  Practice, Criminal,
    Jury and jurors, Voir dire.  Evidence, Identification of
    inanimate object.  Due Process of Law, Identification of
    inanimate object.

Indictments found and returned in the Superior Court
Department on September 27, 2013.

The cases were tried before Brian A. Davis, J.

Patrick A. Michaud for the defendant.
Laurie Yeshulas, Assistant District Attorney, for the
Commonwealth.

---

[1] This case was initially heard by a panel comprising Justices Vuono, Meade, and Rubin.  After circulation of a majority and a dissenting opinion to the other justices of the Appeals Court, the panel was expanded to include Chief Justice Green and Justice Wolohojian.  See Sciaba Constr. Corp. v. Boston, 35 Mass. App. Ct. 181, 181 n.2 (1993) (explaining procedure if majority of justices agree with dissent).

RUBIN, J.  Following a jury trial in the Superior Court, the defendant, Dominick R. Alves, who is African-American, was convicted in this racially charged criminal case of aggravated assault and battery by means of a dangerous weapon (knife), G. L. c. 265, § 15A (c) (i); two counts of assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A (b); and possession of a class B controlled substance (cocaine), G. L. c. 94C, § 34.[2]  He now appeals.

The defendant's principal argument is that he was denied a fair trial before a jury of his peers because the trial judge improperly struck certain prospective jurors for cause.  We agree; the judge's voir dire questions improperly excluded jurors holding a specific belief with respect to racial discrimination "born of the prospective juror's life experiences," and who, as a consequence, might have been particularly attentive to the racial dynamics of the case.  Commonwealth v. Williams, 481 Mass. 443, 449 (2019).  The consequence was that the defendant was tried by an all-white jury that did not contain a representative cross-section of the community, and whose selection denied his right to an impartial jury, in violation of art. 12 of the Massachusetts Declaration

---

[2] The defendant was found not guilty of assault with intent to murder, G. L. c. 265, § 15.  The Commonwealth entered a nolle prosequi on one count of assault and battery.

of Rights.  We therefore conclude that his convictions must be reversed and the case remanded so that he may have a new trial before a properly constituted jury.

Background.  The events that led to the defendant's arrest were as follows.  Based on the testimony at trial, the jury could have found that the violence on the night in question began at about 1 A.M., when someone from among a group of white people who had been attending a graduation party, and who were escorting Timothy Rounds, a friend of the defendant, away from their party, punched Rounds in the mouth.  The defendant, who is African-American, approached Rounds, who told the defendant he was afraid of the group of white men.  The defendant took a few steps toward the group and told them to leave Rounds alone.

Three or four of the group, whom Rounds did not know, responded by shouting racial epithets at the defendant, calling him "nigger" and "nigger boy."  The defendant told Rounds to run, which he did.

Sometime later, someone who was identified as the defendant punched one of the white men in the back of the head, and ran into a crowd of over thirty people, many African-American.  The adult son of the man who had been punched testified that he, the son, ran into the crowd yelling, "Which one of you fucking niggers hit my father?"

The son grabbed an individual identified as the defendant and they began fighting.  The son was stabbed.  A friend of the son, the stabbing victim, testified that, after he watched the stabbing, he yelled, "Which one of you niggers just stabbed my friend."  The friend also admitted that he might have posted on the website Facebook the day after the incident, "Bet that nigger is regretting it, too."  And, at the very end of his testimony, he volunteered, completely unsolicited, the following:  "Want to hear an old saying? . . .  They say, 'Niggers come in . . . all colors.'"

After the stabbing, the stabbing victim's brother called 911 to report the altercation.  The brother testified that he described the black individuals in the area, including both the defendant and some who were helping his brother, the stabbing victim, as "fucking niggers."

A fourth witness, the initial punching victim, the father of the stabbing victim, testified that he "could [have]" used the word "nigger" during the altercation but did not think he did.  Furthermore, another friend of the stabbing victim who was a percipient witness testified that he "might [have]" used the word "nigger" on the night in question, and had used it on other occasions, "but not like in a racist way."

Only two out of seven percipient witnesses (apart from Rounds) did not make statements either suggesting that they had,

or explicitly admitting to having, used the word "nigger" to refer to members of the defendant's race.

Voir dire. Prior to jury empanelment the judge informed counsel that he intended to ask, inter alia, the following three questions of each juror in individual voir dire, in the following order: (1) "One or more of the persons who are allegedly assaulted in this case are white, and the defendant is black. Do these facts in any way affect or impair your ability to render a fair and just verdict with respect to some, or all of the charges against the defendant?"; (2) "Would you be influenced in any way by the defendant's race in reaching a verdict in this case?"; and (3) "Would you be able to fairly and impartially weigh the credibility of a witness who has shown to have used a derogator[y] racial term?" The judge, however, ultimately did not ask most of the prospective jurors the third question as he had framed. He began questioning the prospective jurors by asking them the questions as he had proposed, and three jurors were seated. When he asked the third question of prospective juror no. 17, she responded, "What was the last part?" When the judge repeated the question, the juror paused, and the judge sua sponte rephrased the question. The following colloquy ensued:

> The court: "I will rephrase it. Would the fact that a witness used a derogatory racial term -- is shown to have used a derogatory racial term, would that fact

affect in any way how you would view the credibility or the testimony of that witness?"

Juror 17: "Yes."

The court: "You think it would?"

Juror 17: "Yes."

The court: "You think it would impair? How would it affect how you would view that witness?"

Juror 17: "It would just prove to me that they thought, like, if it's a white person saying something against a black person, that they are somewhat racist."

The court: "I see, and do you think that would affect how you would view whether the person was telling the truth?"

Juror 17: "Yeah."

The court: "You think it would?"

Juror 17: "Yeah."

The court: "All right, ma'am. I am going to excuse you. Thank you very much for coming."

As should be clear, the "rephrased" third question was a different question entirely from the one initially proposed by the judge. It did not ask whether the fact that a witness had used a racial slur would render the juror unable to be fair or impartial. Rather, as prospective juror no. 17 understood, it asked whether a witness's use of a racial slur in the past would affect the juror's assessment of the

witness's credibility when he was testifying against a member of the racial group against whom he had spoken the slur.[3]

After the colloquy with prospective juror no. 17, the prosecutor requested that the judge continue to use this version of the third question, and the judge responded, "I'll try to do it that way going forward." The judge used this new question or some equivalent formulation for the rest of empanelment, never returning to the question that asked prospective jurors whether they could fairly and impartially evaluate the credibility of a witness who used derogatory racial terms.

The next juror excused for cause on the basis of this question was prospective juror no. 21. The judge asked this prospective juror, "If you heard that one or more of the witnesses in this case had used a derogatory racial comment or term, how would that affect your view or your ability to weigh the credibility, the truthfulness of the witness?" After clarifying the meaning of the question, the prospective juror responded only, "Yes," and the judge excused her.

Defense counsel objected, and pointed out that, of the entire venire on the first day of empanelment, the excused

---

[3] Given our disposition, we need not determine whether the question as initially phrased by the judge would have been permissible.

prospective juror was one of only two people of color.[4]  The other prospective juror of color, prospective juror no. 37, was also excused because of his response to the question.  In response to the judge's question, prospective juror no. 37 said, "Yes, it would. . . .  Because I'd feel they're being biased, you know."  Defense counsel at this point objected to the exclusion for cause and also moved to discharge the entire venire.

Over the course of the two-day empanelment process, a total of eleven prospective jurors were excused for cause because they gave some form of an affirmative response to this new version of the third question, including the only identifiable people of color who underwent voir dire.[5]  This included prospective juror no. 24, whose response was, "Maybe, yeah," and prospective juror no. 19, who stated only, "I might wonder if prejudice has played into it."

---

[4]  Defense counsel described for the record prospective juror no. 21 as having "darker skin color," and prospective juror no. 37 as "appear[ing] to be of Cape Verdean background." The record contains no further information about the race of each of those prospective jurors, and we accordingly refer to them as being "of color."

[5] From the first day of empanelment, prospective juror nos. 17, 21, 23, 24, 28, 37, and 63; from the second day of empanelment, prospective juror nos. 11, 19, 25, and 26.

Depending on all the facts and circumstances, in a case like this it may be reasonable to conclude that a witness who has used what "is widely regarded as the most hateful and offensive" racial slur against African-Americans, see Thomas O'Connor Constructors, Inc. v. Massachusetts Comm'n Against Discrimination, 72 Mass. App. Ct. 549, 567 (2008) (Rubin, J., concurring in judgment and dissenting in part), is less credible in his testimony against a black criminal defendant. Indeed, those prospective jurors who were given the chance to explain their answers, such as prospective juror nos. 17 and 37, quite reasonably explained the reasons why a witness's prior use of a racial slur might affect their judgments of the witness's credibility in testifying against a black defendant. They were not asked, and did not say, that they could not be fair or impartial in assessing the witness's testimony. They merely described accurately why the prior use of a racist term might have bearing on a witness's credibility in certain circumstances. Yet they were excused for cause.

Other prospective jurors, such as prospective juror nos. 24 and 19, were given no opportunity to explain or elaborate on their statements regarding their views of the credibility of witnesses who had used derogatory racial terms. They were excused for cause simply for saying that a witness's prior use of a racial slur might play a role in their assessment of the

credibility of the witness when he or she was testifying against a defendant about whose racial group he or she had used a derogatory slur.

Unsurprisingly, as a result of excusing prospective jurors for cause if they responded affirmatively to the rephrased question in this racially charged case, the only two jurors of color identified during voir dire were excused, and this defendant was tried before an all-white jury, none of whose members who were asked thought that a person who had expressed racist views might be less credible if he or she testified against a black person.

The recent case of Williams, 481 Mass. 443, makes clear that considerations such as these are not appropriate bases on which to exclude prospective jurors.  That case held that "a prospective juror may not be excused for cause merely because he or she believes that African-American males receive disparate treatment in the criminal justice system."  Id. at 451.  A judge who excludes a prospective juror on this basis "mistakenly equates an inability to disregard one's life experiences and resulting beliefs with an inability to be impartial.  A judge should not assume that a prospective juror is unable to be impartial merely because he or she expressed uncertainty about being able to put aside his or her firmly held beliefs. Instead, an otherwise qualified prospective juror should be

excused for cause only if, given his or her experiences and resulting beliefs, the judge concludes that the prospective juror is unable to fairly evaluate the evidence presented and properly apply the law."  Id. at 452.

This reasoning applies with full force to prospective jurors whose life experiences lead them to believe that people who have expressed racist views against members of the defendant's race are less likely to be credible when testifying against that defendant.  These prospective jurors are not necessarily "unable to fairly evaluate the evidence presented and properly apply the law."  Williams, 481 Mass. at 452.

Indeed, we recently explained in the context of police officer witnesses that it does not amount to bias when a prospective juror has a rational reason to find one category of witness more or less credible.  In Commonwealth v. Nelson, 91 Mass. App. Ct. 645 (2017), we held that a judge did not err by seating a juror who admitted that he was "more inclined to believe the testimony of a police officer over someone who is not a police officer solely because that individual is a police officer."  Id. at 646.  In Nelson, after the juror gave this response, the trial judge subsequently asked him "whether he would 'be able to listen to all of the facts and evidence in the case before [he would] be able to render a fair verdict.'"  Id. The juror responded affirmatively.  We held that the juror did

not demonstrate bias and that he was qualified to serve.  See id. at 650.  The same of course goes for prospective jurors who are predisposed reasonably to negatively view the credibility of certain classes of witnesses, such as those with criminal records.  See Commonwealth v. Nickerson, 388 Mass. 246, 249 (1983) ("At trial, a juror may consider the record of conviction of crime of a witness on the issue of that witness's credibility").  That rule likewise applies to prospective jurors who believe that witnesses who have used words of racial hatred toward a defendant's racial group may be less likely to be credible when testifying against that defendant.  "Individuals are not expected to ignore as jurors what they know as men —- or women."  Williams, 481 Mass. at 451, quoting J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 149 (1994) (O'Connor, J., concurring).

Article 12 of the Massachusetts Declaration of Rights "mandate[s] that a jury be drawn from a fair and representative cross section of the community."  Commonwealth v. Soares, 377 Mass. 461, 478 (1979).  "A defendant's right to a fair and impartial jury includes the right to a jury drawn from a venire representing a fair cross section of the community."  Williams, 481 Mass. at 455.  As such, the fair cross section requirement is an aspect of the right to a fair and impartial jury.  See Taylor v. Louisiana, 419 U.S. 522, 530-531 (1975).  Of course

there is no requirement "that each jury include constituents of every group in the population." Soares, supra at 481.  And, one "reason why absolute proportionality cannot be guaranteed is the proper provision for removal of any prospective juror, whether of a discrete group or not," who is unable to be fair and impartial.  Id. at 482.

In this case, however, although we do not suggest the judge asked the question in bad faith, the two people of color on the jury venire who were brought up for individual voir dire were removed not for an inability to be fair or impartial, but for giving a reasonable answer to an improper question that could only be reasonably understood to be asking whether a witness who had engaged in racist speech might be less credible when testifying against a member of the racial minority group he has indicated he despises.  Because only people of color were improperly excluded from the jury, the defendant was deprived of the right to be tried by a jury representing a fair cross section of the community in violation of the Massachusetts Constitution and Declaration of Rights.[6]  So fundamental is the right to trial by a jury composed of a fair cross section of the

---

[6] Actions by the court system can of course violate a defendant's fair cross section right even if they are done without discriminatory intent.  See, e.g., Commonwealth v. Tolentino, 422 Mass. 515, 524 (1996) (selection of jury venires).

community that, if there is no "fair cross section on the petit jury," Soares, 377 Mass. at 483, the defendant is entitled to a new trial without any need to show further prejudice. See id. at 492. Thus, the defendant's conviction must be reversed, and the case remanded for a new trial before a properly constituted jury.

The defendant's art. 12 right to an impartial jury was also violated for another independent reason: The jury were scrubbed improperly of a group of jurors, representative of a substantial segment of society, who might have been particularly sensitive to the racial dynamics at play in the case, and whose absence may have affected the jury's assessment of the credibility of witnesses who expressed racist views toward people of the defendant's race.[7] Indeed, eleven of the twenty-nine prospective jurors who were asked the "rephrased" question -- over one-third of prospective jurors drawn from the venire who were asked -- were struck by the judge solely for their answer.[8] Treating the beliefs of prospective jurors as "in themselves disqualifying"

---

[7] This of course is not to say that none of the seated jurors could have had any sensitivity to the racial dynamics involved in the case.

[8] The concurrence asserts that "[i]n most instances . . . the determination of impartiality was made on the basis of follow-up questions after a prospective juror responded affirmatively to the question." Post at        . Without belaboring the point, that is not the case with respect to these eleven jurors.

is impermissible when the disqualification of the prospective jurors holding those beliefs would distort the composition of the jury in a way that, because of the race of the defendant, might affect the jury's judgment on an issue entrusted to them -- in this case the credibility of certain witnesses. Williams, 481 Mass. at 457, quoting Mason v. United States, 170 A.3d 182, 187 (D.C. 2017) (in case with African-American defendant, improper exclusion of juror because of her belief that criminal justice system is biased against African-American men did not require reversal because judge did not treat such beliefs of prospective jurors as "in themselves disqualifying"). See Witherspoon v. Illinois, 391 U.S. 510, 522 (1968) (under Sixth Amendment to United States Constitution, systematic exclusion of "veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction," where their views would not prevent or substantially impair performance of their duties as jurors in accordance with judge's instructions and their oath, deprives defendant right to impartial jury); United States v. Salamone, 800 F.2d 1216, 1226-1227 (3d Cir. 1986) (conviction of defendant on firearms charges by jury from which individuals were excluded solely on basis of membership in

National Rifle Association violated principles of fundamental fairness).[9]  This, too, requires reversal.[10]

Identification of the defendant's shirt. In light of our conclusion we need not reach the defendant's other arguments save for one that relates to an issue that may recur on retrial. One of the defenses at trial was misidentification.  The defendant filed a motion in limine to preclude the introduction

---

[9] As these cases make clear, and contrary to the suggestion in the concurrence, post at        n. 6, this aspect of the right to an impartial jury does not fall within the rubric of the "representative cross section of the community" requirement. To the extent the concurrence reads our opinion to rest on the possibility that this exclusion created a less racially sensitive jury, it misperceives our argument.  The problem with the exclusion of this group of prospective jurors is that, because of the question that led to the exclusion, it eliminated prospective jurors, not shown to be partial, in a way that skewed the composition of the jury with respect to how they would judge an issue entrusted to them, the credibility of certain witnesses.

[10] The defendant did not object at trial, but, because this case involves the systematic exclusion of an entire class of jurors, not just a single juror, this is a structural error. See Williams, 481 Mass. at 456-457 (distinguishing cases such as this, in which error is structural).  On direct appeal reversal is therefore required without inquiry into prejudice, that is, whether there was a substantial risk of a miscarriage of justice.  See Commonwealth v. Villanueva, 47 Mass. App. Ct. 905, 906 (1999).  Cf. Commonwealth v. LaChance, 469 Mass. 854, 856-860 (2014) (limiting this rule in context of collateral attack on conviction claiming ineffective assistance of counsel for failure to object to court room closure).  If an examination of the question were warranted, the defendant has certainly shown prejudice.  This is not a case like Williams where the Commonwealth had sufficient additional peremptory challenges left at the end of jury selection that could have been used on the excluded jurors.  Here, eleven jurors were excluded.  The Commonwealth had but two remaining peremptory challenges.

of a witness's identification of a shirt, made on the basis of a single photograph of the shirt that witness Detective Sergeant Jacinto sent to witness Anthony Mallozzi's cell phone by text message, as the shirt worn by the defendant during the melee. The defendant alleged that the identification procedure was impermissibly suggestive. At a pretrial hearing, the defendant also challenged the identification of the same shirt by a second witness, Alex Tarr, to whom the shirt had been Tarr had been shown at the police station. Relying on Commonwealth v. Simmons, 383 Mass. 46, 49-53 (1981), S.C., 392 Mass. 45, cert. denied, 469 U.S. 861 (1984), the judge concluded that testimony regarding the identification of the shirt was admissible, and denied the motion in limine. The defendant preserved his objection.

Appellate courts have recognized that, "in an extreme case, the degree of suggestiveness of an identification procedure concerning an inanimate object might rise to the level of a denial of due process." Simmons, 383 Mass. at 51. See Commonwealth v. Thomas, 476 Mass. 451, 466 (2017). "Due process may be denied by admitting in evidence an identification of an inanimate object where, first, the police knew or reasonably should have known that identification of the object effectively would identify the defendant as the perpetrator of the crime and where, second, the police needlessly and strongly suggested to

the witness that the object was the object at issue." Id. at 466-467. See Commonwealth v. Spann, 383 Mass. 142, 148 (1981) (extreme case of suggestiveness might involve improper statements by police during identification procedure). But, although "the police should take reasonable steps to avoid unnecessary suggestiveness in what will generally be a showup procedure, that is, the showing of the object alone or a single photograph of the object," Thomas, supra at 467, "it has never been the case that identification of an object must be subject to the same precautions given the identification of a person." Simmons, supra at 51, quoting Commonwealth v. Carter, 271 Pa. Super. 508, 516 (1979).

The defendant contends on appeal that the actions of the police in showing the shirt to Tarr and texting the single photograph to Mallozzi, without giving any precautionary warnings, were so unduly suggestive that they violated the defendant's due process rights under art. 12. "Where an identification arises from a police procedure, we apply the standard appropriate for review of a decision implicating constitutional rights: we review a judge's findings of fact to determine whether they are clearly erroneous but review without deference the judge's application of the law to the facts as found." Commonwealth v. Johnson, 473 Mass. 594, 602 (2016). See Commonwealth v. Watson, 455 Mass. 246, 250 (2009).

We conclude the judge here did not err.[11]  To begin with, it does not appear that identification of the shirt by Tarr was even used to "identify the defendant as the perpetrator of the crime."  Thomas, 476 Mass. at 467.  Tarr had already identified the perpetrator of the crime as the defendant through a photograph array before the defendant's shirt was shown to him. In any event, in the arguments below, the defendant alleged only that there had been with respect to each witness a one-shirt "showup."  There was no evidence that Jacinto made any improper statements to either witness, nor of anything else beyond the mere fact of each witness being shown a single shirt, that might have "strongly suggested" the shirt was the defendant's.  See id.  On this record, we do not think the defendant has borne his burden of demonstrating that this was an "extreme" case that rose to the level of a violation of due process.

Conclusion.  The judgments are reversed, the verdicts are set aside, and the case is remanded to the trial court, where,

---

[11] The judge resolved the identification issue on constitutional grounds, and that is the focus of the defendant's arguments on appeal.  Accordingly, we do not consider whether the witnesses' identifications of the shirt should have been deemed inadmissible based on our common law of evidence.  See Thomas, 476 Mass. at 465-466.

should the Commonwealth choose to retry the defendant, he shall have a new trial before a properly constituted jury.[12,13]

So ordered.

---

[12] The defendant argues that there should be no retrial on the charge of aggravated assault and battery by means of a dangerous weapon because the evidence was insufficient to support the verdict.  He claims that the Commonwealth failed to present any evidence to show that he stabbed the stabbing victim in the back with a knife and, therefore, the jury's guilty verdict on this charge was based on speculation.  We disagree. Although none of the witnesses saw a knife in the defendant's hands, a jury can reasonably infer the use of a dangerous weapon from testimony about an altercation and the nature of a victim's wounds.  See Commonwealth v. Liakos, 12 Mass. App. Ct. 57, 60-61 (1981).  See also Commonwealth v. Roman, 43 Mass. App. Ct. 733, 736 (1997), S.C., 427 Mass. 1006 (1998).  One witness who knew the defendant testified that he saw him fighting with the stabbing victim, that the victim landed on the ground and was bleeding profusely, and that the defendant ran away.  Another witness testified that he saw the defendant punching the victim, that the victim's back was to the defendant, that he saw the victim fall, and that he heard the victim screaming that he had been stabbed.  Finally, the victim sustained serious stab wounds to the base of his neck and his upper back, and he spent four days in the hospital.  This evidence, if believed by the jury, was sufficient to support a verdict of guilt.

[13] To the extent the defendant requests a change of venue, we express no opinion on the matter, which should be decided in the first instance in the trial court, should the Commonwealth choose to retry the defendant and should he continue to seek such a change.

VUONO, J. (concurring, with whom Meade, J., joins).  The defendant contends that he was denied a fair trial because the individual voir dire question about the use of racist language resulted in the removal of two prospective jurors of color.[1]  Both individuals, prospective juror no. 21 and prospective juror no. 37, responded to the question by indicating that a witness's use of a derogatory racial term could negatively affect their view of the witness's credibility or truthfulness.  Thereafter, they were excused for cause without further inquiry over the defendant's objection.[2]  The defendant asserts that the judge

---

[1] As the majority observes, the record contains no information about the race of these two prospective jurors other than trial counsel's assessment of them.  See Commonwealth v. Prunty, 462 Mass. 295, 298 n.5 (2012).

[2] It bears noting that the defendant's objection was based solely on the composition of the jury venire.  He argued that his rights under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights were violated because the venire did not adequately represent a fair cross section of the community in Plymouth County.  He did not claim, as he does on appeal, that the dismissal of either prospective juror violated his right to be tried by an impartial jury.  After prospective juror no. 21 was excused, the defendant orally moved to dismiss the venire and strike the seated jurors.  He renewed his motion after prospective juror no. 37 was dismissed.  The motions were denied and the process of selecting a jury continued.  The following day, the defendant filed a written motion to strike the venire.  The motion was supported by an affidavit from counsel who averred that, in his opinion, there were no African-Americans in the jury pool.  He also stated that the two potential "minority" jurors had to be struck for cause.  Following the hearing, the judge concluded that the defendant had not met his burden of establishing a prima facie case of jury underrepresentation and

failed to question these two potential jurors thoroughly and, as a result, could not assess whether either individual properly could be seated on the jury.  I agree that the judge's voir dire of these two individuals was incomplete and, therefore, the dismissal of these two prospective jurors was an abuse of discretion.  See Commonwealth v. Ruell, 459 Mass. 126, 136, cert. denied, 565 U.S. 841 (2011).  In the circumstances presented, this error entitles the defendant to a new trial.  I write separately, however, for two reasons.  First, I do not believe, as the majority maintains, that the question -- to which there was no objection before or after it was modified -- was inherently flawed.  The problem here was not so much with the question itself, but with the absence of sufficient follow-up questions to determine whether a juror who responded affirmatively to the question could nevertheless fairly evaluate the evidence and apply the law as provided by the judge.  Second, I do not agree with the majority's conclusion that nine additional prospective jurors were improperly removed for cause on the basis of their responses to the question.

1.  The voir dire questions.  Before trial commenced, defense counsel and the prosecutor informed the judge that the

---

denied the motion.  In light of my conclusion that the defendant is entitled to a new trial, there is no need to address the validity of the defendant's challenge to the venire.

facts in this case were "racially charged."[3] Both sides filed a motion for the examination of jurors, setting forth proposed questions to be asked during the individual voir dire portion of the jury selection process for the purpose of exposing potential racial bias. Given the inflammatory and offensive comments made by several witnesses, the judge appropriately was concerned about such bias. See Commonwealth v. Cruzado, 480 Mass. 275, 279 (2018). After discussion, the judge informed the parties that he intended to ask the following question: "Would you be able to fairly and impartially weigh the credibility of a witness who has [been] shown to have used a derogator[y] racial term?" There were no objections to the language of this question, which was carefully crafted to identify whether any prospective jurors harbored a bias against persons who used derogatory language toward African-Americans and, therefore, could not be impartial. See Commonwealth v. Prunty, 462 Mass. 295, 311 (2012) (potential jurors may be asked about race-

---

[3] The defendant waived his Miranda rights and was interviewed by the police. He denied committing the stabbing, but admitted that he had hit three people after "he was jumped by [fifteen] white guys." The defendant's theory of the case was that a melee erupted when he told a group of racist and intoxicated partygoers to leave his friend alone, that he acted in self-defense when he threw punches at several people, and that the credibility of the victim and partygoers who testified against him was undermined by their racial bias, as exhibited by their use of hateful and offensive racial slurs.

related bias). This question was asked of the first fourteen prospective jurors, three of whom were seated on the jury.

Thereafter, as the majority explains, the question was rephrased after one prospective juror asked for clarification. Going forward, the judge asked the following question, with slight variations: "If you heard that one or more of the witnesses in this case had used a derogatory racial comment or term, how would that affect your view or your ability to weigh the credibility, the truthfulness of that witness?" As the majority correctly observes, the modified question did not ask whether the fact that a witness had used a racial slur would render the juror unable to be fair and impartial. As such, the question was not an improvement, as the judge and the parties clearly had intended.[4] Instead, the question was inartful and, in the absence of further inquiry, improper. In most instances, however, the determination of impartiality was made on the basis

---

[4] There is no doubt, in my view, that the judge's decision to modify the question was made in good faith. As Chief Justice Gants acknowledged in his concurring opinion in Commonwealth v. Williams, 481 Mass. 443, 458 (2019), "there are times, with the benefit of additional thought and the wisdom of hindsight, in which a judge will recognize that a discussion with a juror could have been handled more artfully. We have no template for such questioning; nor would it make sense to attempt to create one because there are so many different ways that prospective jurors may share their concerns about the risk of possible bias. Addressing such concerns is necessarily improvisational, and therefore often imperfect." I further note that the judge did not have the benefit of the court's analysis in Williams, which was decided after the trial in this case concluded.

of follow-up questions after a prospective juror responded affirmatively to the question.

By way of example, in response to the modified question, prospective juror no. 18 initially indicated that a witness's use of a derogatory racial term "might affect" his view of the witness's credibility. The judge then asked a series of follow-up questions, the answers to which satisfied the judge that the prospective juror could be impartial. There was no objection and prospective juror no. 18 was seated on the jury. Another example of the efficacy of the question when the judge continued the inquiry was the voir dire of prospective juror no. 19. In response to the question, prospective juror no. 19 told the judge that she would view a witness who used a derogatory racial term "as kind of a jerk," but not necessarily as less truthful. During the course of the voir dire, she agreed with the judge that she "would look at the entire package . . . of how the person acted on the stand." After being assured of her impartiality, the judge seated prospective juror no. 19 on the jury with no objection. Yet another example is the voir dire of prospective juror no. 14, who was seated on the jury during the second day of empanelment. She responded to the question as follows: "Well, the way I was brought up, I mean, I know that language of how they say racism and whatever they call it and everything, and I've never done that, never. I just don't."

The judge then probed further, asking the prospective juror to explain how the use of a derogatory racial term would affect her view of the witness's credibility. The prospective juror replied, "It's very hard to say. I mean like I said, when I was brought up that word was never used in my home." The prospective juror continued: "And my father told me to respect white, chinese, red, yellow, black and white." Additional questions were posed by the judge, including the following question: "We are looking for jurors who will come and sit on this jury, listen carefully to the evidence and then decide the case based solely on the evidence presented here at trial with no preconceived notion, bias, prejudice, one way or the other, decide it right down the middle based solely on the evidence and the law that I will give to the jury in my instructions, and you would have to follow the law regardless of whether you agree with it or not. Would you be able to do that?" Prospective juror no. 14 responded affirmatively, "Yes, I would," and subsequently was seated on the jury.

Clearly, with respect to prospective juror nos. 18 and 19 on the first day of empanelment and prospective juror no. 14 on the second day of empanelment, the judge was in a position to determine whether, despite the prospective jurors' natural and understandable opinion about people who use racist language, they could nevertheless be impartial jurors in this case. My

7

point is that the question itself did not exclude prospective jurors who held a specific belief with respect to racial discrimination.  Rather, it was the absence of further inquiry in the case of some of the prospective jurors, most notably (and unfortunately) with respect to the two prospective jurors of color, that resulted in the risk that such jurors might be excluded.

2.  The nine additional prospective jurors excused for cause.  The defendant argues, and the majority agrees, that apart from prospective juror no. 21 and prospective juror no. 37, nine additional prospective jurors (nos. 17, 23, 24, 28, and 63 from the first day of empanelment, and nos. 11, 19, 25, and 26 from the second day of empanelment) were improperly excused on the basis of their responses to either the original or the modified question.  The defendant did not object when the judge dismissed these potential jurors.  The absence of an objection is not surprising; as I previously noted, in the majority of instances the responses of these prospective jurors during individual voir dire made clear that they could not be impartial.  I also note that the defendant did not argue at trial, nor does he claim on appeal, that these nine prospective jurors should have been seated on the jury.  Nor does he claim that these prospective jurors were replaced by others who were not impartial.  Finally, I disagree with the majority's

contention that, as a result of removing these potential jurors for cause, the jury were "scrubbed" of prospective jurors "who might have been particularly sensitive to the racial dynamics at play in this case."  In fact, as noted above, several potential jurors who expressed concerns and sensitivity about the use of racially derogatory language were seated on the jury.[5]

Certainly, there can be no doubt that a juror's reasonable beliefs about people who use racial epithets should not be automatically disqualifying.  See Williams, 481 Mass. at 448-449 ("Where . . . a prospective juror has expressed an opinion or world view based upon his or her life experience or belief system, rather than asking him or her to set it aside [which is difficult if not impossible to do], a judge must determine

_____

[5] I also disagree with the majority's position that these nine prospective jurors comprised a "group of jurors" whose exclusion "distort[ed] the composition of the jury" resulting in a violation of the defendant's right to an impartial jury under art. 12.  As I understand the majority's view, they posit that by excluding this "group" of prospective jurors who are racially sensitive, the likelihood that the defendant's jury would be drawn from a representative "substantial segment of society," i.e., a representative cross section of the community, was reduced.  The court addressed a similar argument in Williams, 481 Mass. at 457, and rejected it:  "It is the exclusion of prospective jurors 'solely by virtue of their membership in, or affiliation with, particular, defined groupings in the community' that violates a defendant's constitutional right to a fair and impartial jury, not excusing prospective jurors for cause because the judge believes, after voir dire, that they cannot be impartial" (citations omitted).  In Williams, as here, the prospective juror who was removed for cause did not belong to a "particular, defined, group[] in the community."  Id., quoting Soares, 377 Mass. at 486.

whether, given that particular opinion, the juror nevertheless is able to be impartial in the case to be tried").  Here, however, none of these nine prospective jurors were dismissed because they could not put aside their life experiences and resulting world view.  They were excused, properly, after the judge determined that they could not listen to the evidence and apply the law.  The judge was much better positioned than we are to evaluate a prospective juror's credibility and impartiality.  See Commonwealth v. Hunt, 462 Mass. 807, 821 (2012) ("We give great deference to a judge's decision to excuse a prospective juror for cause during empanelment, because a judge who has spoken directly with the juror is better positioned than we are to evaluate the juror's credibility and impartiality").  See also Commonwealth v. McCoy, 456 Mass. 838, 843 (2010) (judge entitled to rely on juror's demeanor and responses when ascertaining bias).  Because I discern no abuse of discretion regarding the dismissal of these nine additional prospective jurors, I disagree with the majority that excusing them for cause provides a basis to order a new trial.